## UNITED STATES *v.* DENVER AND RIO GRANDE RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 3.   Argued October 10, 1893. — Decided October 23, 1893.

After the expiration of the time limited by the act of June 8, 1872, 17 Stat. 339, c. 354, for the completion of its road to Santa Fé, if not before that time, the Denver and Rio Grande Railway Company was entitled to claim the benefit of the act of March 3, 1875, 18 Stat. 482, c. 151, upon complying with its conditions.

The act of March 3, 1875, 18 Stat. 482, c. 151, granting a right of way to railroads through the public lands, and authorizing them to take therefrom timber or other materials necessary for the construction of their roadways, station buildings, depots, machine-shops, sidetracks, turnouts, water stations, etc., permits a railway company to use the timber or material so taken on portions of its line remote from the place from which it is taken.

In its ordinary acceptation and enlarged sense, the term "railroad" includes all structures which are necessary and essential to its operation.

While it is well settled that public grants are to be construed strictly as against the grantees, they are not to be so construed as to defeat the intent of the legislature, or to withhold what is given.

General legislation, offering advantages in the public lands to individuals or corporations as an inducement to the accomplishment of enterprises of a *quasi* public character through undeveloped public domain should receive a more liberal construction than is given to an ordinary private grant.

It is not decided that the act of March 3, 1875, gave a right to take timber from the public domain for making rolling stock; nor what structure, if any, not enumerated in that act would constitute necessary, essential, or constituent parts of a railroad.

THE case is stated in the opinion.

*Mr. Solicitor General,* with whom was *Mr. William A. Maury* on the brief, for plaintiffs in error cited: *Railway Co.* v. *Alling,* 99 U. S. 463; *United States* v. *Burlington & Missouri River Railroad,* 98 U. S. 334; *United States* v. *Chaplin,* 31 Fed. Rep. 890; *Leavenworth, Lawrence &c. Railway* v. *United States,* 92 U. S. 733; *Slidell* v. *Grandjean,* 111 U. S. 412; *Dubuque & Pacific Railroad* v. *Litchfield,* 23 How. 66; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420; *Providence Bank* v. *Billings,* 4 Pet. 514; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659; *Oregon Railway & Navigation Co.* v. *Oregonian Railway Co.,* 130 U. S. 1; *Portland, Saco & Portsmouth Railroad* v. *Saco,* 60 Maine, 196; *Stevens* v. *Erie Railway,* 6 C. E. Green, (21 N. J. Eq.,) 259.

*Mr. Edward O. Wolcott,* (with whom was *Mr. Joel F. Vaile* on the brief,) for defendant in error, cited: *United States* v. *Denver & Rio Grande Railway,* 31 Fed. Rep. 886; *Edwards* v. *Darby,* 12 Wheat. 206; *Johnson* v. *Towsley,* 13 Wall. 72; *United States* v. *Moore,* 95 U. S. 760; *Brown* v. *United States,* 113 U. S. 568; *United States* v. *Bank of North Carolina,* 6 Pet. 26; *United States* v. *Chaplin,* 31 Fed. Rep. 890; *Henderson's Lessee* v. *Long,* Cooke, (Tenn.,) 128; *Courtright* v. *Cedar Rapids &c. Railroad,* 35 Iowa, 386; *United States* v. *Burlington &c. Railroad,* 98 U. S. 334; *Cother* v. *Midland Railway,* 2 Phillips Ch. 469; *Lake Superior &c. Railroad* v. *United States,* 93 U. S. 442; *Baltimore* v. *Baltimore & Ohio Railroad,* 21 Maryland, 50; *Missouri, Kansas &c. Railroad* v. *Kansas Pacific Railroad,* 97 U. S. 491.

MR. JUSTICE JACKSON delivered the opinion of the court.

The record in this case presents for our consideration and determination the following questions: First, is the defendant,

a railway company, duly chartered and organized in 1870 under the laws of the Territory of Colorado, for the purpose of locating, constructing, and operating an extensive system of railway and telegraph lines, entitled to the benefits of the act of Congress approved March 3, 1875, 18 Stat. 482, c. 152, entitled "An act granting to railroads the right of way through the public lands of the United States;" and, second, if so entitled, is the defendant authorized or permitted, under a proper construction of said act, to take from the public lands adjacent to the line of the railroad, timber or other material necessary for the construction of its roadway, station buildings, depots, machine shops, side tracks, turnouts, water stations, &c., and use the same on portions of its line remote from the place from which such timber or material may be taken; or does the act limit the railroad company to timber or other material found in the vicinity of the place where the work of construction is going on?

These questions, constituting the matters in controversy between the parties, arise in this way: The plaintiffs in error, who were the plaintiffs below, brought their suit against the defendant in the District Court of the United States for the District of Colorado, to recover the value of timber alleged to have been taken by the defendant from the public domain between October 1, 1882, and November 1, 1883. The defendant, by its answer, interposed a general denial of the allegations of the complaint, and for a further defence justified the taking of the timber under the special act of Congress approved June 8, 1872, 17 Stat. 339, c. 354, and under the general act of March 3, 1875. The case was tried upon the following agreed statement of facts:

"1. The timber sued for in said action was cut by William A. Eckerly & Company, as agents for the Denver and Rio Grande Railway Company, and delivered to said railway company.

"2. That the attached statement correctly shows the kinds and amounts of timber so cut and delivered, and also shows the time of cutting, the purposes for which it was cut and used, and the prices paid for cutting and delivering the same.

" 3. The said timber was cut in Montrose County, Colorado, and near the town of Montrose, and upon public, unoccupied, and unentered lands of the United States.

" 4. That the lands from which the timber was cut were along and near and adjacent to the line of railway of said company.

" 5. That the portion of the line of railway through said county of Montrose, and in the vicinity of said town of Montrose, was not constructed or completed until after June 8, 1882, and that on June 8, 1882, said line of railway was only constructed and completed as far westward as Cebolla, in Gunnison County, Colorado.

" 6. That said company had not completed its line of railway to Santa Fé on June 8, 1882, nor has it ever so completed it.

" 7. That of the timber cut as aforesaid, a part was used on portions of the line of railway out to Grand Junction, constructed and completed after June 8, 1882, and for the purposes of construction of railway, erection of section and depot houses, snow-sheds, fences, &c.

" And a part was shipped by the Denver and Rio Grande Railway for similar purposes to the Denver and Rio Grande Western Railway, to be used in the Territory of Utah, as shown in the attached statement, and $1000 worth was used for repairs on portions of road completed prior to June 8, 1882.

" 8. That as to all of its line of railway constructed after June 8, 1882, the said company strictly complied with all the requirements of the act of Congress approved March 3d, 1875, entitled, ' An act granting railroads the right of way through the public lands of the United States.' "

On this agreed statement of facts there were submitted to the court for decision several legal propositions and questions, which were not, however, separately considered and passed upon, and need not be here specially noticed. The case made by the facts agreed upon was intended to be a test case to obtain a definite and positive adjudication by the court of the rights of the railway company with regard to cutting timber

from public lands under the provisions of the two acts which have been referred to.

The District Court entered judgment for the plaintiffs for $24,926.25, the agreed value of the timber taken. From this judgment the defendant took its writ of error to the Circuit Court of the United States for the District of Colorado, which modified the judgment of the District Court by charging the defendant first, with the sum of $1000, as the value of the timber used for repairs on that portion of the road east of Cebolla, Colorado, which had been completed prior to June 8, 1882; and for the further sum of $1229.45, as the value of the timber shipped by the defendant to the Denver and Rio Grande Western Railway Company to be used in the Territory of Utah ; but as to the rest of the timber used on portions of the road west of Montrose, out to Grand Junction, for the purpose of constructing the defendant's railway, erecting bridges, section houses, depots, bunk houses, stock yards, water tanks, &c., held that the defendant was not liable therefor, and to that extent reversed the judgment of the District Court. The plaintiffs prosecute the present writ of error to review and reverse this judgment of the Circuit Court. The defendant has sued out no cross writ of error, and concedes its liability for the timber with which it has been charged by the judgment of the Circuit Court.

If the defendant is not entitled to the benefits of the act of March 3, 1875, or if that act, properly construed, does not permit or allow the defendant to use timber taken from adjacent lands except for the construction of adjacent portions of its line of road and structures connected therewith, then the judgment of the Circuit Court is erroneous. If, however, the defendant can rightfully claim the benefits of the act of March 3, 1875, and if that act authorizes it to take from the public lands adjacent to its line of road timber necessary for the construction of its railway, and use the same at points distant from the place at which the timber was taken, then the judgment below should be affirmed.

By the act of Congress approved June 8, 1872, " the right of way over the public domain, one hundred feet in width on

each side of the track, together with such public lands adjacent thereto as may be needed for depots, shops, and other buildings for railway purposes, and for yard room and side tracks, not exceeding twenty acres at any one station, and not more than one station in every ten miles [of the road] and the right to take from the public lands adjacent thereto stone, timber, earth, water, and other material required for the construction and repair of its railway and telegraphic line," was granted and confirmed unto the defendant in error, its successors, and assigns. Attached to this grant was a proviso "that said company shall complete its railway to a point on the Rio Grande as far south as Santa Fé within five years of the passage of this act, and shall complete fifty miles additional south of said point in each year thereafter, and in default thereof the rights and privileges herein granted shall be rendered null and void *so far as respects the unfinished portion of said road.*"

By the general act of 1875 it was enacted:

"SEC. 1. That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take from the public lands adjacent to the line of said road material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road."

By the fourth section of this act it was declared:

"SEC. 4. That any railroad company desiring to secure the benefits of this act, shall within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and if upon unsurveyed lands, within

twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided*, That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road."

As shown by the agreed statement of facts, the railway company on June 8, 1882, had completed its line westward only as far as Cebolla, Colorado, and has never completed it to Santa Fé. The right of the railway company, under the special act of 1872, to take timber west of Cebolla for the construction of its line accordingly terminated on June 8, 1882. The timber in controversy was taken after that date from the vicinity of Montrose, Montrose County, Colorado, some forty-five miles west of Cebolla, and is justifiable, on the part of the defendant, only under the act of March 3, 1875 — if it is entitled to the benefits of that act.

It is urged on behalf of the plaintiffs in error that the defendant, having accepted the special grant of a right of way, and the right to take timber, made to it by the act of June 8, 1872, and this being a subsisting grant at the time of the passage of the act of March 3, 1875, it cannot rightfully claim the benefits of the latter act. It is said that the two grants could not properly coexist, and that the later act should not be construed as including the defendant railway company, because the special act of 1872 was more beneficial, in the fact that it conferred upon the railway company, and its successors, the right to take timber both for construction and repairs, and that the defendant, having elected to take the benefits of that grant, cannot escape the conditions attached to it, nor claim the benefits of the act of 1875, passed while the defendant was enjoying the special benefits conferred upon it by the act of 1872.

We cannot accede to the correctness of this proposition.

The general and special acts are in no way inconsistent with each other. The general nature and purpose of the act of 1875 were manifestly to promote the building of railroads through the immense public domain remaining unsettled and undeveloped at the time of its passage. It was not a mere bounty for the benefit of the railroads that might accept its provisions, but was legislation intended to promote the interests of the government in opening to settlement, and in enhancing the value of those public lands through or near which such railroads might be constructed. To induce the investment of capital in the construction of railroads through the public domain, Congress had previously granted special rights, such as were conferred upon the defendant by the act of 1872; but, by this act of 1875, a general offer was made to any and all railroad companies of so much of the public domain as might be necessary for right of way, and ground adjacent thereto, for station buildings, depots, machine shops, side tracks, turnouts, and water stations, with the right to take timber from the public lands adjacent to such road for the construction of the railway, provided such railway company should comply with the provisions of section four of the act. This general offer was not limited or restricted as to the time within which the offer should be accepted, nor in respect to the company or companies who should be entitled to the benefits thereof upon complying with the provisions of the act. Its terms are sufficiently broad and general to include the defendant, who, by the agreed statement of facts, asserted and claimed the benefits thereof as to all that portion of its line of railway constructed after June 8, 1882, when its rights under the act of June 8, 1872, terminated so far as respected its unfinished line west of Cebolla. No railway company could claim the benefits of the act of 1875 until it had accepted its provisions and complied with the conditions required by the fourth section thereof. Upon such compliance, and not before, the benefits intended to be conferred by the act would attach. It does not appear from the record or from the agreed statement of facts at what date the defendant accepted the provisions of the act of 1875, and complied with the conditions upon which it was entitled

to the benefits thereof. But whether such compliance on the part of the railway company was before or after June 8, 1882, it sufficiently appears that it only claimed and asserted the benefits under that act after its rights under the act of 1872 had terminated, so far as concerns the unfinished portion of its line; for by the eighth paragraph of the agreed statement of facts it is admitted "that as to all of its railway constructed after June 8, 1882, that said company strictly complied with all the requirements of the act of Congress, approved March 3, 1875, entitled 'An act granting railroads the right of way through the public lands of the United States.'"

Now, the act of 1875 remaining in force as a general law and as a general offer to any railway company, the defendant clearly had a right after June 8, 1882, if it did not have before, to claim the benefits of that act. That act was not merely a legislative offer of benefits, but operated as a law of the government and remained in full force and effect, not only while the defendant was enjoying the benefits of the act of 1872, but subsequently, after its rights under that special act had expired. Under these circumstances it cannot be properly said that the railway company is either claiming or asserting rights conferred by, or coexisting under, both the special grant and the general law; for the benefits of the latter, whether accepted before or after the rights conferred by the special act of 1872 had ceased or terminated, were not actually asserted or put in practical use until after June 8, 1882, and then only in respect to unfinished portions of the line not covered by the act of 1872.

No reason is perceived why the defendant, after its rights under the special act had terminated, should not be permitted to take the benefits of the general law of 1875, so far as it related to the construction of its line west of Cebolla, and built after June 8, 1882, when its right to take material for construction ceased under the act of 1872.

Upon what principle does the enjoyment by the defendant of the rights and benefits conferred by the earlier special act preclude or estop it from accepting the benefits offered by the later general act after the special rights and privileges had

terminated? We know of no such principle. There is nothing in the case of *Railway Co.* v. *Alling*, 99 U. S. 463, cited on behalf of plaintiffs in error, inconsistent with this view of the subject. In that case the Denver Company (the defendant in error here) had in 1871 and 1872 merely made a preliminary survey of its line through the Grand Cañon of the Arkansas, but had postponed the actual location and final appropriation of its roadway through that defile until April, 1878, at which date it was subject to the provisions of the act of 1875, (the second section of which conferred upon other roads the right, upon certain terms and conditions, to use its track or roadway through such defiles,) for the reason that after the passage of that act the Denver Company had accepted the benefit of the act of March 3, 1877, extending the time for the completion of its road to Santa Fé, which extension the court assumed would hardly have been given by Congress except subject to the conditions contained in the act of 1875. Being subject to the provisions of the law, as contained in the second section of the act of 1875, while in the exercise of its rights under the act of 1872, as amended by the act of 1877, in no way prevented the railway company from complying with its conditions and securing the benefits conferred by the first section of the act of 1875. We are, therefore, of opinion that the defendant in error was clearly entitled, after June 8, 1882, if not before, to the benefits of the act of 1875, upon complying, as it did, with the conditions of that act.

But it is urged that, even if the defendant is entitled to the benefits of the act of 1875, it is not permitted to take timber from the public domain and ship it for use in the construction of its railroad at points distant from the place at which the timber was taken, but is limited to the taking and use of timber in the vicinity, or adjacent to the place, where the work of construction is going on; and that it is not entitled to take timber for the erection of depots, section houses, bunk houses, stock yards, water tanks, &c. This presents the question as to where, or at what place, and for what purposes the railway company may rightfully use timber, or other material, taken from the public lands adjacent to the line of

its road. By the express terms of the act, the timber or other material which it is entitled to take must be taken from public lands "adjacent" to the line of the road, and must not be merely suitable but "necessary for the construction of the railroad." By the agreed statement of facts it is admitted that the timber in question was taken from the public, unoccupied, unentered lands of the United States, which were located along, near, and adjacent to the line of the defendant's road. No question, therefore, can be raised as to the proper locality from which it was taken. Was the defendant, under a proper construction of the act, limited and restricted in the use of such timber for purposes of construction to points or places on the line of the road adjacent to the locality from which the timber was taken? While the act does limit the railway company in respect to the place or locality from which timber or other material may be taken, by confining the right to public lands *adjacent* to the line of the road, it does not, by either express terms, or by any fair or necessary implication, place any limitation as to the place at which such timber may be used. The license to take timber is not, by the language of the act, limited to what is necessary for the construction of such portion of the road as is adjacent to the place from which the timber is taken, but extends to the construction of the entire "railroad." The right is given to use material "necessary for the construction of said railroad." This language treats the railroad as an entirety, in the construction of which it was the purpose of Congress to aid by conferring upon any railway company, entitled to the benefits of the act, the right to take timber necessary for such construction from the public lands adjacent to the line of the road. This intention would be narrowed, if not defeated, if it were held that the timber, which the railway company had the right to take for use in the construction of its line, could be rightfully used only upon such portions of the line as might be contiguous to the place from which the timber was taken. If Congress had intended to impose any such restriction upon the use of timber or other material taken from adjacent public lands, it should have been so expressed. No rule of interpretation requires

this court to so construe the act as to confine the use of timber that may be taken from a proper place for the purpose of construction to any particular or defined portion of the railroad. To do this would require the court to read into the statute the same language, as to the place of use, which is found in the statute as to the place of taking. In other words, it would require the court to interpolate into the statute the provision that the place at which the timber shall be used shall be "contiguous, adjoining, or adjacent" to the place from which it is taken. The place of *use* is not, by the language of the statute, qualified, restricted, or defined, except to the extent of the construction of the railroad as such, and it is not to be inferred from the restriction or limitation imposed as to the *place* from which it may be rightfully taken that it is to be used only adjacent to such place.

As to the purposes for which the material may be used, it must be borne in mind that the benefits intended to be conferred by the act are not confined or limited to the roadbed, or roadway, as the foundation upon which the superstructure is to rest, but are extended to the "railroad," as a completed or perfected structure.

In addition to the right of way and the right to take timber for the purposes of this completed or entire structure, called the "railroad," there is granted by the act "also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water tanks, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road." By this provision, these structures, which are necessary appurtenances to all railroads, may fairly be regarded as parts or portions of the *railroad*, whose construction it was the purpose of Congress to aid. In its ordinary acceptation and enlarged sense the term *railroad* fairly includes all structures which are necessary and essential to its operation. As already stated, it was not the intention of Congress to aid in the mere construction of the roadbed, or roadway, but to aid in the construction of the railroad as such, which term has a far more extended signification than the mere track, or roadway. If the language of the act

had shown an intention to aid merely in the construction of the roadbed, or roadway, it is clear that such structures as station houses, &c., would not have been included; but when the ground is given on which to erect such structures in and by the same act which confers the right of way, and also gives the right to take from adjacent public lands timber necessary for the construction of the *railroad* as such, it may be reasonably claimed that timber necessary for that construction may be used or applied in the erection of the structures constituting an essential part or portion of the *railroad*. It is no forced interpretation to hold that the right to take timber was intended to aid in the erection of structures without which the railroad would have been practically useless.

It could hardly be questioned that a grant of power to construct a railroad would include the right to erect necessary structures, such as station houses, water tanks, &c., as essential and constituent parts thereof. This being so, it is difficult to understand why the grant of a right to take timber for the construction of a railroad should not equally extend to and include the same structures, constituting, as they do, necessary and indispensable appendages thereto.

Again, exemption from taxation is construed with greater strictness in favor of the State than grants of public property or rights, for the reason that taxation is more essential to the existence of government than ownership and possession of public property. Yet it has been held in several well-considered cases that where a railroad is exempt from taxation, such exemption extends to structures like those in question. Thus in the case of the *Lehigh Coal and Navigation Co.* v. *Northampton County*, 8 W. & S. 334, it was held that as an incorporated canal was not taxable, not only the bed, berm-bank, and towpath of the canal, but the lock-houses and collectors' houses were also exempt, these being considered constituent parts of the canal or necessarily incident thereto. So in *Railroad Co.* v. *Berks County*, 6 Penn. St. 70, it was held that as the railroad was exempt from taxation, water-stations and depots, including the offices and places to hold cars, &c., being necessary and indispensable to the construction and use of the road, were

within the exemption, while warehouses and coal lots, intended for the mere convenience of the road, were not so exempt. The principle of these cases is followed and illustrated in the case of *State* v. *Commissioners of Mansfield*, 3 Zabr., (23 N. J. Law,) 510, and in the case of *Worcester* v. *Western Railroad*, 4 Met. (Mass.) 564.

It is undoubtedly, as urged by the plaintiffs in error, the well-settled rule of this court that public grants are construed strictly against the grantees, but they are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication. In *Winona & St. Peter Railroad* v. *Barney*, 113 U. S. 618, 625, Mr. Justice Field, speaking for the court, thus states the rule upon this subject : "The acts making the grants   .  .  . are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purposes declared on their face, and read all parts of them together."

Looking to the condition of the country, and the purposes intended to be accomplished by the act, this language of the court furnishes the proper rule of construction of the act of 1875. When an act, operating as a general law, and manifesting clearly the intention of Congress to secure public advantages, or to subserve the public interests and welfare by means of benefits more or less valuable, offers to individuals or to corporations as an inducement to undertake and accomplish great and expensive enterprises or works of a *quasi* public character in or through an immense and undeveloped public domain, such legislation stands upon a somewhat different footing from merely a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted. *Bradley* v. *New York & New Haven Railroad*, 21 Connecticut, 294; Pierce on Railroads, 491.

This is the rule, we think, properly applicable to the con-

struction of the act of 1875, rather than the more strict rule of construction adopted in the case of purely private grants ; and in view of this character of the act, we are of opinion that the benefits intended for the construction of the railroad in permitting the use of timber or other material, should be extended to and include the structures mentioned in the act as a part of such railroad.

It appears from the certificate attached to the agreed statement of facts that a small portion of the timber taken by the defendant, amounting to $150.15, was used in or about " cars." The defendant was not charged by the judgment of the court below with this item, for the reason, as we assume, that these cars were not employed in the transportation of traffic, but were of such character as hand-cars employed in the work of construction. In affirming the judgment of the court below as to this item, this court does not mean to be understood as holding that the defendant, under the act of 1875, has the right to use timber taken from the public lands for the purpose of constructing rolling stock or equipment employed in its transportation business. Neither are we called upon in this case to determine what other structures, if any, besides those enumerated in the first section of the act of 1875, would constitute necessary, essential, or constituent parts of the railroad.

Our conclusion is that there is no error in the judgment below, and that it should be                           *Affirmed.*