BaeNet, Judge,
delivered the opinion of the court:
The question for decision in this case arises from the demurrer of the defendants to the amended petition herein of the plaintiffs.
*35 A demurrer was interposed to the original petition, which was sustained by this court with an opinion March 19, 1917. As the amended petition contains all of the averments of the original petition and more, the opinion on the first demurrer will be withdrawn and this opinion stand as the opinion upon both demurrers.
The facts set forth in the petition as amended are substantially as follows: The plaintiffs, in June, 1906, were the timber agents of the Denver, Northwestern & Pacific Ey. Co., for the purpose of cutting and manufacturing railroad ties on the public lands adjacent to the line of said railway then under construction in Colorado to be used and which were used in the construction of said railway under the authority of the act of Congress of March 3, 1875, 18 Stat., 482. As a part of the consideration for the labor of cutting and manufacturing said ties said railway company agreed to give to the plaintiffs all the tops or “ tie slash ” of the trees cut down for that purpose. Pursuant to said contract and prior to October, 1906, the plaintiffs manufactured and delivered to said railway company 88,797 ties, leaving a large amount of said tie slash. On October 10, 1906, the plaintiffs received the following letter from an officer of-the General Land Office:
“DENVER, Colo., Oct. 10, 1906.
“ Caldwell & Dunwody,

“Arrow, Golo.

“ Sir : As per instructions of the Commissioner of the General Land Office, you are hereby granted authority as agent of the Denver, Northwestern & Pacific Eailway to cut timber under act of Congress of March 3, 1875, upon the public lands, to sell and dispose of tops and lops of trees that you may cut for construction of said road, which can not be used by said road for construction purposes.
“ Before selling the same you must inquire of the proper officers of the said Denver, Northwestern & Pacific Eailway if they will purchase said tops and lops that you may have on hand.
“ You must also carefully pile the brush so as to avoid danger of destruction of public timber by forest fires, as heretofore instructed. You will report to this office from time to time the character and amount of timber sold under this authority, and to whom sold.
*36 “ I herewith quote the instructions to this office from the Commissioner of the General Land. Office:
“ ‘ It is incumbent upon your office to see to it that all contractors employed by the said E. E. Co. shall cut timber strictly in accordance with the rules and regulations; they shall confine their cutting strictly to such timber as is needed by the railroad company, and such “ refuse ” as results from such cutting may be disposed of by the railroad company or by the contractors without violation of existing law.
“ ‘ Where it is found that a contractor has violated the law in that he has cut or sold timber other than that described above, prompt and effective action should be taken on your part to the extent of requiring the railroad company to nullify his contract, or to notify the railroad company that you will no longer recognize his agency and thereafter proceed against him as in ordinary cases of timber trespass.’
“ Very respectfully,
“(Signed) N. J. O’BrieN,
“ Chief Field Division, G. L. OP
Thereafter the plaintiffs entered into a further contract with said railway company to cut and manufacture for it additional ties upon the public lands on the same terms as above stated and under which latter contract they did manufacture and deliver to said railway company a considerable number of ties which were also used in the construction of said raihvay, leaving a further amount of tie slash. In December, 1906, the plaintiffs agreed to sell to the Fraser Eiver Timber Co., of Denver, Colo., a large amount of said tie slash; also to sell to the Le3rden Coal Co, of the same place, 200 cars of mining props, the same to be cut by the plaintiffs from said tie slash, all the tie slash so sold to be used in the State of Colorado.
The plaintiffs also aver that they intended to utilize the remainder of said tie slash for purposes mentioned in the acts of 1878 and 1891 hereinafter quoted.
March 2, 1907, the land upon which said ties had been cut was, by Presidential proclamation, included ih the Medicine Bow National Forest. Thereafter the officers of the Forest Service allowed the plaintiffs to remove the poles which they had already cut from said tie slash together with the tie slash on a so-called “ fire yard ” 200 feet wide along said railway for a distance of 2 miles, but refused to allow them the remainder of said tie slash, but took possession of *37 the same, sold it, and the proceeds were covered into the United States Treasury. This suit is brought to recover the sum of such proceeds.
The defendants demur to the petition upon the grounds (1) that this court is without jurisdiction, (2) that the petition does not state the cause of action.
The jurisdiction of this court is attacked upon the ground that the facts alleged show, if they show any cause of action at all (which is denied), it is in tort and not upon contract either express or implied.
That money belonging to a citizen which has reached the United States Treasury, whether through the trespass and wrongdoing of an officer of the United States or not, can be recovered in this court was decided by this court in Thayer v. United States, 20 C. Cls., 137. The same question arose in State Bank v. United States, 10 C. Cls., 519, where the same doctrine was held, and was affirmed by the Supreme Court on appeal, 96 U. S., 30.
These cases would seem to settle the question of jurisdiction, but as the demurrer is sustained upon other grounds it is not necessary to decide that question. Hence the question here decided is whether the plaintiffs ever had any title to the tie slashings in question, for if not, of course they never had any right to the proceeds, wherever they may be. The railway company, through its agents, cut and manufactured the ties under the right conferred by the act of March 3, 1875, sufra, which provides:
“That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take from the public lands adjacent to the line of said road material, earth, stone, and timber necessary for the construction of said railroad. * * * ”
The plaintiffs argue that the grant to the railway of timber for construction purposes carried the right to the whole tree when cut down though only a part of it may be used *38 for railroad construction. Such a construction of the statute would open the door to many abuses. The railway might slash down all of the valuable timber along its right of way, use a trifling part of it for its construction, and sell the remainder. If needed for that purpose, the railway could have used the tie slash in its further construction, but we think it acquired no title to the same for the purpose of traffic. The same became liable to be appropriated for certain purposes by citizens of the State of Colorado under another statute, which will be hereafter quoted and construed.
Statutes granting privileges or relinquishing rights of the public are to be strictly construed against the grantee. Wisconsin Central Rd. Co. v. United States, 164 U. S., 190; 27 C. Cls., 440. Nothing passes by the grant but what is conveyed in clear and explicit language. United States v. Oregon & Cal. R. R. Co., 164 U. S., 529. As a further example of the strict construction to be given to this statute, we refer to the case of United States v. Denver & Rio Grande Ry. Co., 150 U. S., 1, where it is said:
“This court does not mean to be understood as holding that the defendant under the act of 1875 has the right to use the timber taken from the public lands for the purpose of constructing rolling stock or equipment employed in its transportation business.”
This question came before the court in the case of United States v. Denver & Rio Grande Ry. Co., 190 Fed., 825, and it was there held that the railway company acquired no title to such tops, and we think the doctrine therein announced was sound. Under this decision the said railway company never acquired any title to the tie slash in question, and hence could not confer any on the plaintiffs.
But the plaintiffs rely upon the letter quoted from an officer of the Land Office, in effect making a gift to them of the same. We do not think such officer had any authority to bestow such gift. It has been repeatedly held by this and other courts that, unless expressly authorized thereto by Congress, no officer of the United States has authority to give away the property of the Government. Steele v. United States, 113 U. S., 128; Flores v. United States, 18 C. Cls., 252.
*39 It would, indeed, lead to favoritism and rank injustice if an officer of the Land Office could select parties who should receive timber upon the public domain, for if he could exercise such discrimination as to this tie slash he could exercise the same discrimination as to standing timber to which certain citizens are entitled as provided under another statute about to be quoted.
To maintain their title to the tie slash in question the plaintiffs further rely upon the act of March 3, 1891, 26 Stat., 1095,1099, which provides as follows:
“And in the States of Colorado, Montana, Idaho, North Dakota, and South Dakota, Wyoming, and in the District of Alaska and the gold and silver regions of Nevada, and the Territory of Utah, in any criminal prosecution or civil action by the United States for a trespass on such public timberlands or to recover timber or lumber cut thereon, it shall be a defense if the defendant shall show that the said timber was so cut or removed from the timberlands for use in such State or Territory by a resident thereof for agricultural, mining, manufacturing, or domestic purposes, and has not been transported out of the same.” * * *
Under this act it was clearly never intended to give citizens the right to traffic in the timber upon the public lands, no matter what use may have been the purpose to make of it. This act was construed by Assistant Attorney General Van Devanter, now Justice of the Supreme Court, in an opinion to the Secretary of the Interior November 27, 1899, in volume 29, Decisions of the Department of the Interior relating to Public Lands, p. 322. He said:
“ There is nothing in this act which suggests that it was the purpose of Congress to thereby authorize or provide for the sale of timber on the public lands. As gathered from a careful examination of the terms of the act, its purpose seems to have been to modify the law relating to the cutting and removal of timber from lands of the United States by denying to the Government the right then existing to demand a conviction in the criminal prosecution, or a recovery in a civil action when in any of the States, Territories, or regions named, timber is cut or removed from the public timber lands for use in such State or Territory by a resident thereof for agricultural, mining, manufacturing, or domestic purposes under the rules and regulations made and prescribed by the Secretary of the Interior, and is not transported out of that State or Territory. * * *
*40 “ I am of the opinion that the legislation under consideration does not authorize the sale of timber, and inasmuch as the regulations of March 17, 1898, supra, provide for sales thereof, I advise that said regulations be reformed and brought within the authority given the Secretary of the Interior by the statute under which they were prescribed.”
In accordance with this opinion the Secretary of the Interior issued rules and regulations governing the appropriation of timber under this act, as he was authorized to do by its terms and, among other things, directed that “the cutting or removal of timber or lumber to an amount exceeding stumpage value of $50 in any one year will not be permitted except upon application to the Secretary of the Interior and after the granting of a special permit.” This opinion and these regulations will show the absurdity of maintaining that under this statute the plaintiffs could acquire title to timber of the value of $26,454.90, which is the value placed by the plaintiffs upon the tie slash, the possession of which they were deprived, and acquire the title for the purpose of selling it to other parties.
It should be here remarked that said act of March 3, 1891, contains a provision that “nothing herein contained shall operate to enlarge the rights -of any railway company to cut timber upon the public domain.”
The act of June 3, 1878, does not enter into the discussion of this case, as it is averred in the petition that the timber in question was cut on nonmineral land, and the act is applicable solely to public mineral lands; and also expressly provides that it shall not extend to railroad corporations.
It is unnecessary to proceed further with the discussion of this branch of the case, as it is clear that the plaintiffs must rely alone upon their rights acquired from the railroad company under the act of 1875.
It follows from the foregoing that the demurrer to the petition as amended should be and the same is hereby sustained and the petition dismissed.
Hat, Judge; DowNET, Judge; Booth, Judge, and Campbell, Chief Justice, concur.