**MONTANA WILDERNESS ASSOCIATION, Nine Quarter Circle Ranch, and the Wilderness Society, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE: John McGuire, its chief; Lewis Hawkes, Gallatin National Forest Supervisor; United States Fish and Wildlife Service, Harry Willoughby, its regional director; Burlington Northern, Inc., a Delaware Corporation; Bob Bergland, Secretary of Agriculture, Defendants.**

No. 79–29–Bu..

United States District Court,
D. Montana,
Butte Division.

Sept. 11, 1980.

James H. Goetz, Bozeman, Mont., for plaintiffs.

James G. Watt; Michael H. Hyer, Denver, Colo., and J. C. Garlington of Garlington, Lohn & Robinson, Missoula, Mont., for Mountain States Legal Foundation, appearing as amicus curiae.

Kurt W. Kroschel and K. Kent Koolen, Billings, Mont., for Burlington Northern.

Rick Anderson, Asst. U. S. Atty., Butte, Mont., and Dorothy Burakreis & Peter Coppleman, Dept. of Justice, Washington, D. C., Land & Natural Resources, Washington, D. C., for all United States defendants.

John L. Peterson, Butte, Mont., and Shea & Gardner, Washington, and Richard S. Wasserstrom, Washington, D. C., Intervenor as a party defendant for Nat. Forest Products Ass'n.

## MEMORANDUM OPINION

WILLIAM D. MURRAY, Senior District Judge.

### I. INTRODUCTION

Plaintiffs bring this action against several federal defendants and Burlington Northern, Inc., seeking a preliminary injunction and moving for partial summary judgment. The court denied the motion for preliminary injunction and will issue findings of fact and conclusions of law in a separate order.

This memorandum opinion is to address those legal issues raised by the various motions and cross–motions for partial summary judgment. Prior to addressing those issues, a brief explanation of the controversy will be undertaken, followed by a historical discussion and a synopsis of the instant litigation.

### A. *Factual Background*

Defendant Burlington Northern owns property in the Buck Creek and Yellow Mules drainages within the confines of the highly scenic Gallatin National Forest southwest of Bozeman, Montana, and plans to conduct logging activities on that property. In order to reach its property and carry out the proposed logging Burlington Northern must construct a road across National Forest lands.

The Buck Creek and Yellow Mules drainages are within the Taylor–Hilgard Wilderness Study Area which has been set aside by Congress under the Montana Wilderness Study Act of 1977, P.L. 95–150, 91 Stat. 1243, for further study and Congressional consideration regarding its potential for wilderness designation. Burlington Northern's plans to log portions of its property within the boundaries of the area would disqualify that area from possible wilderness designation. For that reason, among others, plaintiffs seek to prevent construction of the proposed logging road.

The national forest sections over which the road is to be constructed are intermingled with Burlington Northern sections in what is generally known as a "checkerboard" fashion. This pattern of ownership resulted from the grant of alternate sections by the United States to Burlington Northern's corporate predecessor, Northern Pacific Railroad Co., under the Northern Pacific land grants of 1864. A brief discussion of the history of the Northern Pacific land grants and land grants to the railroads in general is undertaken below.[1]

### B. *Historical Background*

On July 2, 1864, an act creating the Northern Pacific Railroad Company and authorizing that company to construct a railroad from Lake Superior to Puget Sound was enacted. 13 Stat. 365. That Act was the outgrowth of a tremendous desire on behalf of the federal government that the West be settled. Railroads through the unsettled territories were the means to accomplish this goal. Yet private investors were unwilling to build the railroads without substantial governmental inducement. Inducement came in the form of an enormous grant of public land to the Northern Pacific Railroad Company, which was typical of other Congressional land–grant subsidies to railroads in that era. See, *Leo Sheep Co. v. United States*, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979).

Under the terms of the 1864 Act, Northern Pacific was granted every alternate section of public land, not mineral, to the amount of twenty sections per mile on each side of the line through territories and ten

---

1. Decisions containing fuller historical discussions of the railroad land grants include, *Leo Sheep Co. v. United States*, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979); *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942); *United States v. Northern Pacific Ry. Co.*, 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210 (1940); and *Platt v. Union Pacific Ry.*, 99 U.S. 48, 25 L.Ed. 424 (1878).

sections per mile through the states. In case any of these sections had been occupied by homesteaders or otherwise disposed of at the time of definite location of the railroad, Northern Pacific was entitled to select, in lieu thereof, alternate odd–numbered sections not more than ten miles beyond the limits of the grant. In lieu of mineral lands, the company was given the right to select a like quantity of agricultural land "nearest to the line of such road and within fifty miles thereof." 13 Stat. 365, Sec. 3.[2]

The checkerboard ownership pattern came about as a result of opposition to the railroad land grants from strict constructionists who believed that the Constitution provided no authority for the direct use of government funds for internal improvements, such as railroads. *Leo Sheep, supra*, 671–674, 99 S.Ct. 1405–1407. The opponents were ultimately persuaded, however, by the argument that construction of the railroads and the resulting development of the alternate sections granted to the railroads would lead to an appreciation in value of the retained federal lands. It was claimed, therefore, that the land grants were not a direct federal subsidy but rather were a means of increasing federal revenues from the sale of the retained lands. Thus, the checkerboard ownership pattern, now pervasive in the West, was created.

### C. *The Instant Litigation*

In order to construct the proposed road across federal land Burlington Northern applied for and was granted a special use permit by the Forest Service. Following administrative appeal of the decision to issue the permit, plaintiffs filed the instant lawsuit on May 9, 1979, seeking a temporary restraining order and preliminary injunction against construction of the road by Burlington Northern. This court granted the temporary restraining order and scheduled a hearing on the motion for preliminary injunction for September 4, 1979.

In the interim, however, the Forest Service, at the request of the Department of

Justice, suspended the permit and the hearing was vacated. Thereafter, the Secretary of Agriculture requested a formal opinion from the Attorney General to resolve the many questions which had arisen regarding the access rights of landowners whose land, like Burlington Northern's, is completely surrounded by property owned by the United States.

On June 23, 1980, the Attorney General issued his formal Opinion responding to the questions posed by the Secretary of Agriculture. In that Opinion, the Attorney General concluded that 16 U.S.C. § 478 upon which the Forest Service had previously relied to find a right of access did not provide such a right. He further stated that "a right of access may be implied from the terms of the federal grant only if Congress intended to grant the right." Op. Atty. Gen. at 1–2 (June 23, 1980).

The Department of Agriculture thereafter determined that Burlington Northern has a right of reasonable access implicit in the 1864 land grant and directed the Forest Service to reinstate Burlington Northern's permit, which was done July 30, 1980. Plaintiffs then filed motions for a temporary restraining order, preliminary injunction and motions for partial summary judgment. The court granted the temporary restraining order, but denied the motion for preliminary injunction. This opinion deals with plaintiffs' motion for partial summary judgment and the cross–motions of both federal defendants and Burlington Northern for partial summary judgment.

### II. BURLINGTON NORTHERN HAS ACCESS TO ITS PROPERTY BY WAY OF NECESSITY

Defendant Burlington Northern contends that it has an easement by necessity across the federal lands to reach its own, and has moved for summary judgment on that issue. The motion is resisted by federal defendants and plaintiff, both of whom rely to a great extent on Attorney General Civi-

---

**2.** The provisions of the Act are well summarized in *United States v. Northern Pacific Rail-* *way Co.*, 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210 (1940).

letti's Opinion of June 23, 1980. In that opinion the Attorney General addressed the precise issue here presented and concluded that

"the common law doctrine of easement by necessity does not apply to land owned by the federal government." Op. Atty. Gen. at 2 (June 23, 1980).

While it is true that opinions of the Attorney General are given great weight, an Attorney General's opinion is not the judgment of a court of law and is not binding on this court. *Pueblo of Taos v. Andrus*, 475 F.Supp. 359, 365, n. 4 (D.D.C. 1979). In this instance his conclusion as to the doctrine of easements by necessity must be rejected and Burlington Northern's motion for summary judgment granted.

Plaintiffs contend that the recent United States Supreme Court decision in *Leo Sheep Co. v. United States*, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) controls this court's decision. The federal defendants and Burlington Northern, while conceding the applicability of *Leo Sheep*, persuasively argue that it is not controlling. A review of the decision is necessary.

Petitioners were livestock companies holding certain odd–numbered sections of land in Wyoming as successors in fee of the Union Pacific Railroad, which had received the land under the Union Pacific Act of 1862, 12 Stat. 489. The government retained the even–numbered sections, creating a checkerboard ownership pattern. The issue presented was whether the United States held an implied easement to build a road across the private land to provide access to a public reservoir. The landowners refused to allow the construction.

Prior to reaching what it considered as the critical issue in the case–whether the government had an implied easement based on the original land grant–the Court considered the question of whether the government had an easement by necessity across the private land. The Court described easement by necessity as follows:

Where a private landowner conveys to another individual a portion of his lands in a certain area and retains the rest, it is presumed at common law that the grantor has reserved an easement to pass over the granted property if such passage is necessary to reach the retained property. These rights–of–way are referred to as "easements by necessity." 440 U.S. at 679, 99 S.Ct. at 1409.

The Court proceeded to hold that the government could not avail itself of the doctrine. The major reason for that conclusion was that "the easement is not actually a matter of necessity in this case because the Government has the power of eminent domain." *Id.* at 679–680, 99 S.Ct. at 1410. The Court stated that "[t]he applicability of the doctrine of easement by necessity in this case is, therefore, somewhat strained, and ultimately of little significance." *Id.* at 680–681, 99 S.Ct. at 1410.

Plaintiffs argue that the *Leo Sheep* holding that the easement by necessity doctrine is not available to the United States is binding on this court's determination of whether the doctrine may be applied *against* the United States. Such is not the case for the *Leo Sheep* holding that the doctrine of easement by necessity does not apply to the sovereign was based on the fact that the government has the power of eminent domain if it requires access. Burlington Northern has no such power. It is apparent, then, that *Leo Sheep* does not settle the question of whether an easement by necessity can apply against the sovereign. It is therefore necessary to examine the few decisions which have dealt with the issue.

Under common law it was assumed that a grantor of property intended to include in the conveyance whatever was necessary for the beneficial use and enjoyment of the property. *Mackie v. United States*, 194 F.Supp. 306, 308 (D.Minn.1961). The preliminary issue this court must decide is whether that common law assumption applies to lands granted by the United States. In *Mackie* the court seems to have simply assumed that an easement by necessity accompanied the government's grant of a patent to the plaintiff's predecessor. The issue

was not directly dealt with, however, because the court found the element of necessity lacking due to the availability of an alternate access route.

Two Ninth Circuit cases have recognized that easements by necessity could be derived from land grants by the federal government. *Superior Oil Co. v. United States*, 353 F.2d 34 (9th Cir. 1965) recognized this impliedly while the issue was spoken to in a footnote in *United States v. Dunn*, 478 F.2d 443 (9th Cir. 1973). In *Dunn*, the dissent argued that an easement by necessity could not be binding on the United States. In a footnote, *Id.* at 444, n. 2, the court stated that while in its judgment the point had not been raised, the court "nevertheless did give it due consideration and concluded that it lacked merit." (citing) 3 Powell, Real Property, 443–444, and *Superior Oil Co. v. United States, supra.* While neither of these cases are controlling they are, at a minimum, persuasive on the issue of whether a way of necessity can exist against the government.

■ Neither the case law on the issue nor the reasons set forth by plaintiffs convince this court that an easement by necessity cannot be asserted against the government. Whether or not the easement actually exists is the next inquiry.

■ There are three prerequisites to the creation of an easement by necessity.[3] First, the titles to the two tracts in question must have been held by one person. Second, the unity of title must have been severed by a conveyance of one of the tracts. Third, the easement must be necessary in order for the owner of the dominant tenement to use his land. This necessity must exist both at the time of the severance of title and at the time of exercise of the easement.

■ In this instance all three factors are established. Prior to the Northern Pacific Railroad land grant in 1864 the United States held title to all of the land. The land grant severed the unity of title. And, finally, due to the checkerboard ownership pattern, easement was and is necessary for access to the property.

While the prerequisites of the common law easement by necessity doctrine are satisfied in this case, that does not of itself establish the easement. This court must look to the intent of the parties to the conveyance and the purposes of the conveyance. *Superior Oil Co. v. United States*, 353 F.2d 34, 36 (9th Cir. 1965).[4] In this case, that is ascertained by looking to the purposes of the 1864 land grant, 13 Stat. 365. While a more detailed analysis of the granting statute appears in Section III below, several observations must be made here which compel the conclusion that Congress intended, or at least expected, that grantees of its land would enjoy a right of access by way of necessity.[5]

As was discussed in Section I B above, the overriding purpose of the railroad land grants was to induce private companies to undertake the task of building the transcontinental railroad. The Act granting lands to the Northern Pacific Railroad Company stated its purpose was one of "aiding in the construction of said railroad and telegraph line to the Pacific Coast," 13 Stat. 365, § 3. Without the land grants as inducement the railroads would not have been built, for as Horace Greeley stated: "The amount is too vast; the enterprise too formidable; the returns too remote and uncertain." Cited in *Leo Sheep v. United States*, 440 U.S. 668, 671, n. 3, 99 S.Ct. 1403, 1406, n. 3, 59 L.Ed.2d 677.

For that reason Congress granted enormous amounts of land to the Northern Pacific Railroad Company. Without access to

---

3. See generally, 3 Powell on Real Property § 410 (1979); 2 Thompson on Real Property § 363, at 424–27 (1961 and 1978 Supp.); Comment, Easements By Way of Necessity Across Federal Lands, 35 Wash.L.Rev. 105, 107 (1960).

4. See also, *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978); *Utah v. Andrus*, 486 F.Supp. 995, 1002 (D.Utah 1979).

5. These observations are also relevant to the discussion of the implied easement issue in Section III below.

those lands, they would be worthless—a barren gift. Thus, it can be assumed that Congress intended that the grantees of the land also be given a right of access to use that land.

The court's decision does not rest on this logical assumption alone, for it was assumed at common law that a grantor intended to include in the conveyance whatever was necessary for the use and enjoyment of the land in question. *Mackie v. United States*, 194 F.Supp. 306, 308 (D.Minn.1961). This general assumption was known to Congress at the time of the 1864 land grant, and the Act was passed with this assumption as background.

■ Furthermore, a railroad land grant is to "receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted." *Leo Sheep v. United States*, 440 U.S. at 683, 99 S.Ct. at 1411, quoting *United States v. Denver and Rio Grande Ry. Co.*, 150 U.S. 1, 14, 14 S.Ct. 11, 15, 37 L.Ed. 975 (1893). The overriding purpose of the land grants was to induce the railroad companies to build railroads, in order that the West be settled and developed. Absent a right of access, the entire congressional scheme would have been frustrated. The grantees could not have utilized the timber on the property, the land would have little value for sale, and settlement would thereby have been retarded.

It is apparent, then, that Burlington Northern has an easement by necessity to cross federal land to reach its own. The common law doctrine of easement by necessity may be applied against the United States when, as here, doing so will effectuate the purposes of the original land grants to the railroad. A more detailed analysis of those purposes is undertaken below.

## III. BURLINGTON NORTHERN HAS AN IMPLIED RIGHT OF ACCESS

The Attorney General, in his opinion of June 23, 1980, stated that

"[a] right of access may be implied from the terms of a federal land grant only if Congress intended to grant the right. This intent may be shown from the circumstances surrounding the grant, including the purpose for which it was made." Op. Atty. Gen. at 2 (June 23, 1980).

■ As explained in the introduction, the Forest Service reinstated Burlington Northern's special use permit on the grounds that "Burlington Northern has a right of reasonable access to its lands implicit in the original statutory grant by Congress to the Northern Pacific Railroad in 1864." The federal defendants and Burlington Northern move for summary judgment as to this issue. The motions must be granted.

Throughout the following analysis it is important to keep in mind the canon of construction controlling this court's review. As stated in Section II, *supra*, a railroad land grant "should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted." *Leo Sheep Co. v. United States*, 440 U.S. 668, 683, 99 S.Ct. 1403, 1411, 59 L.Ed.2d 677, quoting *United States v. Denver & Rio Grande Ry. Co.*, 150 U.S. 1, 14, 14 S.Ct. 11, 15, 37 L.Ed. 975 (1893).

In order to determine whether Congress intended to impliedly grant a right of access to those lands granted to the Northern Pacific in 1864, the court must look to the words of the granting statute and its legislative history. In this case, however, such an inquiry is fruitless, for neither the language of the statute, 13 Stat. 365, nor the extensive Congressional debates mentions the question of access to the granted lands. It is necessary, then, to "look at the condition of the country when the grant was made, as well as the declared purpose of the grant." Op. Atty. Gen. at 20, citing *Leo Sheep, supra*, 440 U.S. at 682, 99 S.Ct. at 1411; *Winona & St. Peter R.R. v. Barney*, 113 U.S. 618, 625, 5 S.Ct. 606, 609, 28 L.Ed. 1109 (1885); and *Platt v. Union Pacific R.R.*, 99 U.S. 48, 64, 25 L.Ed. 424 (1878).

The historical background of the Northern Pacific land grant is set forth in Section I, *supra*. A review of that history indicates the importance that Congress attached to

the construction of the railroads. Settlement and development of the West was of paramount importance, and Congress felt a railroad necessary to accomplish the task. The benefits Congress expected to come of a transcontinental railroad were myriad, including general strengthening of the country through settlement and increased taxation, increased military defense capabilities, food, mineral resources, and development of foreign commerce. (Remarks of Rep. Sweat in debate on the Northern Pacific's land grant bill, Cong.Globe, 38th Cong., 1st Sess. at 1701–1702 (1864).) As stated by Rep. Stevens: "The value of our northwestern possessions depends upon their being populated, and their population depends wholly upon the construction of such a [rail] road." *Id.*, at 2296.

Congress clearly expected that the land given to the railroad would be settled and developed. Indeed, Congress regarded the land it held as worthless without the railroad. Cong.Globe, 38th Cong., 1st Sess. 2296 (1864) (remarks of Rep. Stevens). But with the railroad, it was expected that the land retained by the government would increase in value. One Congressman, Rep. Sloan, predicted a hundred–fold increase in value. *Id.*, at 1699. Such high expectations would be senseless if Congress did not expect and intend that settlers and the railroads themselves have access to the granted lands. Without access, the settlement and development of the West would have been impossible. It is therefore reasonable and logical to conclude that Congress intended that the grantees have access to the land.

Plaintiffs attempt to escape this conclusion by arguing that Congressional intent on the issue of access is inconclusive. This argument the court must reject for all the reasons set forth above. Plaintiffs further argue that Congress intended to deal with rights of access by statute rather than by implication and point to two specific acts of Congress to support their conclusion; Section 8 of the Act of July 26, 1866, 14 Stat.

253, and the Organic Act of June 4, 1897, now codified at 16 U.S.C. § 478. Neither of these statutes support plaintiffs' position.

The 1866 statute, enacted two years after the 1864 Northern Pacific land grant, provided: "The right of way for construction of highways over public lands, not reserved for public uses is hereby granted."[6] Plaintiffs argue that this statute is "clear evidence" that Congress intended to deal with the question of access over federal lands "by statute rather than via dubiously applicable common–law doctrines of implied easements or ways of necessity." As demonstrated by Section II of this court's opinion, the common–law doctrine of ways of necessity is directly applicable.

■ More importantly, however, there are two reasons plaintiffs' argument must be rejected. First, in construing railroad land grants, the court "must look to the condition of the country when the acts were passed, . . . ." *Winona & St. Peter R.R. Co. v. Barney*, 113 U.S. 618, 625, 5 S.Ct. 606, 609, 28 L.Ed. 1109 (1885). The intent of the 1864 Congress cannot be definitively ascertained by examining congressional action taken in 1866. See, *Platt v. Union Pacific R. Co.*, 99 U.S. 48, 63–64, 25 L.Ed. 424 (1878); *Leo Sheep Co. v. United States*, 440 U.S. 668, 677, n. 13, 99 S.Ct. 1403, 1408, 59 L.Ed.2d 677 (1979).

Second, the legislative history of the 1866 statute is silent as to its intended meaning. In *United States v. Dunn*, 478 F.2d 443 (9th Cir. 1973), however, the court, in discussing the statute, stated:

Suffice to say that the statute was passed to protect persons who have already encroached upon the public domain without authorization but who have been allowed to remain there with the knowledge and acquiescence of the government and who should not in conscience be deemed trespassers. It was not intended to grant rights, but instead to give legitimacy to

---

6. The 1866 statute, 14 Stat. 253, later codified as 43 U.S.C. § 932, was repealed in 1976 by the Federal Land Policy and Management Act,

Pub.L. 94–579, Title VII, § 706(a), Oct. 21, 1976, 90 Stat. 2793.

an existing status otherwise indefensible. That such is its purpose is clear.

*Id.*, at 445, n. 2.

Plaintiffs also point to the Organic Act of 1897, *supra*, to support their argument. To the degree that plaintiffs ask this court to divine the intent of the 1864 Congress from Congressional action thirty–three years later, the plea must be rejected. Furthermore, the 1897 Act was enacted after .Congress had soured on the idea of the railroad land grants. As the Supreme Court noted in *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 275, 62 S.Ct. 529, 534, 86 L.Ed. 836 (1942), there was a "sharp change in Congressional policy with respect to railroad grants after 1871, . . . ." Thus, the 1897 Organic Act provides no support for the proposition forwarded by plaintiffs that Congress intended to provide access to the granted lands by statute.

The conclusion that Congress intended a right of access to the granted lands is inescapable. Given the rule of liberal construction in interpreting railroad land grants, *Leo Sheep*, 440 U.S. at 683, 99 S.Ct. at 1411, and the clear Congressional intent that the granted lands be settled and developed, the court must conclude that Congress intended that Northern Pacific (or its successors) have access to the granted lands. The motions of the federal defendants and Burlington Northern as to this issue must be granted.

IV. BURLINGTON NORTHERN'S RIGHT OF ACCESS IS ONE OF THOSE RIGHTS PROTECTED UNDER 16 U.S.C. § 478

Burlington Northern contends that its right of access was recognized and reaffirmed by the second sentence of 16 U.S.C. § 478. That statute states:

"Nothing . . . [herein] . . . shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of national forests, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture. Nor shall anything herein prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests."

■ There is no question that Burlington Northern has no right of access pursuant to the first sentence of 16 U.S.C. § 478, for it is not an "actual settler." Under the second sentence of that statute, however, Burlington Northern's pre–existing right of access is recognized. A review of the history of that Act shows that one reason Congress passed the Act was to make clear that pre–existing access rights of owners of lands surrounded by federal lands were not to be impaired by the establishment of the national forest system.

In 1891, a law authorizing the President to reserve forest lands from the public domain was enacted. Act of March 3, 1891, ch. 561, § 24, 26 Stat. 1103. On February 22, 1897, President Cleveland, pursuant to the 1891 Act, issued proclamations placing some twenty million acres of public land in forest reserves. For a discussion of this action, see Op. Atty. Gen. at 6–7 (June 23, 1980).

In response to President Cleveland's action, which outraged Congressmen from states affected by the proclamations, Congress passed what is now codified as 16 U.S.C. § 478. As stated by the Attorney General, Op. Atty. Gen. at 9 (June 23, 1980), a review of the legislative history "demonstrates that the effect of the second sentence of § 478 is to protect whatever rights and licenses with regard to the public domain existed prior to the reservation." The Attorney General further stated that "[t]he language grants no rights not already in existence." *Id.*

As established above, Burlington Northern, as successor to the Northern Pacific, enjoys a right of access dating back to the 1864 land grant. Thus, 16 U.S.C. § 478 merely protects what is a pre–existing right. If that right of access did not already exist by way of implication or as an easement by necessity, the statute would be of no effect.

To the extent that 16 U.S.C. § 478 has been relied upon by the Forest Service and Burlington Northern as creating an absolute right of access, that reliance is misplaced. See, Op. Atty. Gen. at 2 (June 23, 1980). The mere fact that a person is an inholder does not entitle him to access under 16 U.S.C. § 478, and the Forest Service retains discretionary authority to deny such access, provided that a right of access does not otherwise exist. *Id.* In this case, however, such a right of access does exist.

To the extent it is not inconsistent with the above discussion, Burlington Northern's motion for partial summary judgment as to access under 16 U.S.C. § 478 is granted.

## V. CONCLUSION

■ For all of the reasons stated above the court holds that Burlington Northern does have a right of access to its property across federal lands. The exercise of that right is, of course, not absolute. Under the Constitution, Congress has the authority and responsibility to manage federal land. U.S.Const. Art. IV, § 3, cl. 2. Congress has by statute delegated this authority to agencies such as the Forest Service, e. g., the Federal Land Policy and Management Act, 43 U.S.C. § 1701, *et seq.* The United States, as the holder of the servient tenement, has the right to limit the location and use of Burlington Northern's easement of access, to that which is necessary for Burlington Northern's reasonable enjoyment of that right. Thus, although Burlington Northern must be allowed access to its property, the United States may regulate that access under statutes such as the Federal Land Policy and Management Act. See, *Utah v. Andrus*, 486 F.Supp. 995 (D.Utah 1979). In this case the United

States, through the Forest Service, has so regulated Burlington Northern's access through conditions placed on the special use permit.

For all of the above reasons,

IT IS ORDERED that defendant Burlington Northern's cross–motions for partial summary judgment as to the issues of easement by necessity and implied easement are granted. Its motion as to its right of access pursuant to 16 U.S.C. § 478 is granted insofar as it is not inconsistent with the court's discussion in Section IV above.

IT IS FURTHER ORDERED that the federal defendants' cross–motion for partial summary judgment on the implied easement issue is granted. Its cross–motions for summary judgment as to the issues of easement by necessity and the issue of access under 16 U.S.C. § 478 are denied.

IT IS FURTHER ORDERED that plaintiffs' motions for summary judgment as to all three issues are denied.