## Wytheville.

NEWPORT NEWS SHIPBUILDING AND DRY DOCK CO. *v.* JONES.

June 14, 1906.

Absent, Cardwell, J.

1. WATERS AND WATER COURSES—*Navigable Waters—Ownership—Grant of Power to Adjacent Owners—Incidents—Dredging and Filling in—Corporations—Ultra Vires Acts.*—The navigable waters beyond low-water mark and the soil beneath them, within the territorial limits of a state, are the property of the state and subject to its control, and when it grants to a shipbuilding and dry dock company authority to acquire for its purposes land adjacent to such waters and to construct thereon all the buildings and structures necessary for its purposes, there passes as an incident the right to do such dredging and filling in as are necessary to carry out the powers and rights conferred by its charter. The charter powers are not exhausted by the simple erection of the necessary buildings and structures.

2. WATERS AND WATER COURSES—*Grant of Use to Adjacent Owners—Oyster Planting—Occupation—Notice—Corporations—Charter Powers.* Where a shipbuilding and dry dock company, in pursuance of its charter powers, has acquired a water front as a part of its plant, and has done work upon and in front of its property of such a character as unmistakably to indicate its purpose to occupy the water front as a shipyard, a third person, who leases from the state a part of said front for the purpose of planting oysters thereon, is charged with notice of the use to which the property is being applied, and his acquisition of a part of said front, absolutely essential to the purposes of said company, is in the nature of an intrusion, and is subordinate to the prior and superior rights of the company.

3. POWERS—*General Grant—Necessary Incidents.*—In the absence of express restrictions, a general grant of power to do a particular

thing carries with it, by implication, as an essential incident, authority to do whatever may be reasonably necessary to render the power granted effectual.

Appeal from a decree in chancery of the Circuit Court of the city of Newport News. Decree for the complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*R. G. Bickford,* for the appellant.

*Jones & Woodward, H. R. Pollard* and *C. V. Meredith,* for the appellee.

WHITTLE, J., delivered the opinion of the court.

This appeal is from a decree of the Circuit Court of the city of Newport News, confirming the report of one of its commissioners in chancery, and awarding damages to appellee against the appellant for injury occasioned, by dredging, to an area of ground under the waters of James river, in front of the property of appellant, between Forty-fourth and Forty-sixth streets, lying outside its bulk-head line, which was leased by appellee from the Commonwealth as oyster ground. The litigation originated in an action of unlawful detainer brought by appellee to recover possession of the boundary in dispute, but was subsequently transferred to the equity side of the court by injunctive proceedings on behalf of appellant.

The controlling question for decision is, which claimant possesses superior title to the dredged area?

By an act of the General Assembly of Virginia, approved

January 28, 1886, appellant was incorporated under the name
of the Chesapeake Dry Dock and Construction Company, for
the purpose of establishing and operating a shipyard at some
point at or near Newport News, in the county of Warwick.
The charter, among other privileges, conferred upon the com-
pany the right to construct, operate and maintain a dry dock
of such proportions as it might deem proper, with necessary
buildings, piers, wharves and docks.   Also to build and repair
steamships, ships, vessels and boats of all dimensions, of wood,
iron, steel or other materials; and to acquire, by lease or pur-
chase, such real and personal property as it might deem neces-
sary for its purposes, provided that the amount of land to be
acquired should not exceed one hundred acres.   The company
was likewise authorized to contract with the government of the
United States, affording it such special or exclusive rights in
the works to be constructed, or in any part of them, for anchor-
age, outfitting, construction, docking or repair of its vessels, or
other specified purpose, in time of peace; or for such absolute
command or control in time of war, as might be required by
the government; and all priority of lien or right of title to
make the contract effective.  Acts 1885-'86, p. 42.

Shortly after its incorporation, the company acquired by pur-
chase forty acres of land from the Old Dominion Land Com-
pany, situated on the northerly side of James river, and bounded
on the north by Forty-fourth street; and during the year 1887
constructed a dry dock, together with several wharves, and filled
in a large part of its river front to its outshore bulk-head.

By an act approved February 17, 1890, the name of the
company was changed to the Newport News Shipbuilding and
Dry Dock Company, and certain sections of the original charter
were amended, and the company authorized to build ships of
all dimensions and to that end to construct suitable works and

machinery, and also given the right to acquire an additional one hundred acres of land.

In October of that year the company purchased the land lying between Forty-second and Forty-fourth streets and built out into the waters of James river, along a line corresponding with the southern line of Forty-fourth street extended, the old dry dock breakwater, the line of which became the northerly boundary of the shipyard. A bulk-head was constructed perpendicular to the breakwater and extending southward on a line parallel with Washington avenue, while inshore from the breakwater a water fence was built, stretching out into the waters of James river along the south line of Forty-fourth street extended.

From that time on until December, 1891, the company continued to fill in to its bulk-head line a large portion of the area lying to the southward of Forty-fourth street and its breakwater and fence. In October, 1891, for the purpose of enlarging its holdings to present dimensions to meet the demands of its constantly increasing business, the company purchased the land lying between Forty-fourth and Forty-sixth streets; and in December following removed its fence from the southerly line of Forty-fourth street to the southerly line of Forty-sixth street extended, which constituted the northerly line of its last purchase.

By an act approved December 22, 1891, the company obtained another amendment to its charter, by which its former rights were preserved, and it was empowered to acquire other real estate not exceeding five hundred acres. The charter has been since amended from time to time, as the exigencies of the company required, but the amendments do not affect the present controversy and need not be noticed.

In November, 1892, the water fence along the southerly line

of Forty-sixth street extended was built out into the waters of
James river three hundred feet beyond low-water mark, and
during that year the company filled in a large portion of the
area between Forty-fourth and Forty-sixth streets, a part of
the fill extending out more than one thousand feet beyond the
original low-water mark; and prior to the year 1894 erected
several large buildings upon this filled-in space.   The company
never extended its yard up the river beyond Forty-sixth street,
nor has it acquired, in all, more than seventy acres of land.

This was the situation of affairs in September, 1894, when
appellee made application to the oyster inspector of that district
for an oyster lease of a hundred and fifty acres of land, located
in front of the property of the Old Dominion Land Company
in the vicinity of the shipyard property.   Accordingly, appellee
having complied with the requirements of the statute, on Octo-
ber 22, 1894, the inspector assigned him the ground in ques-
tion.   It appears, however, that the survey overlapped the
property of appellant between Forty-fourth and Forty-sixth
streets, and the dredging upon that overlapped area constitutes
the basis of appellee's claim for damages.

The commissioner reports that the company's last purchase
was made with the intention of extending its plant from Forty-
fourth street to Forty-sixth street up the river; and he further
finds "that the depth of the water in front of the shipyard
property has never been sufficient for its purposes, and it has
always been necessary that it fill in to its property line and
dredge in front of the same in order to conduct its business."
In that connection he adopts the opinion of an experienced ship-
builder, who testified that the right to dredge and fill in is
essential in the construction and operation of a shipyard, and
becomes an absolute necessity when the depth of water is not
sufficient to conveniently and safely launch vessels and moor

them at the docks to install machinery and other heavy weights, and to convey them to and from the shipyard; and concludes: "Your commissioner, therefore reports that the dredging by this plant has been absolutely necessary to carry out the powers and rights given it by its charter," among which he enumerates, providing for the launching of vessels constructed by it, and to supply anchorage for vessels either under construction or repair; and says that "the method adopted was the only one consistent with practical engineering."

It may be observed that this statement of fact, which was reported by the commissioner and confirmed by the court without exception or objection by appellee, affords a complete answer to the contention that the company having built "a dry dock" had exhausted its powers and the dredging complained of was, therefore, *ultra vires.*

The commissioner traces the origin and growth of the shipyard, and characterizes it as one of the largest and most important shipbuilding plants in the world, affording employment to from six thousand to eight thousand men.

Upon the foregoing findings, which must be accepted as the facts in the case, the trial court passed the decree under review, awarding damages against appellant for dredging upon the ground in dispute.

Appellant denies liability, and claims superiority of title to the dredged territory, both as riparian owner and by virtue of its charter rights.    But inasmuch as we are of opinion that the case is plainly with appellant on the second contention upon the undisputed findings of the commissioner, it is unnecessary to consider the important question involved in the first propsition, namely, the extent of the qualified interest of a riparian owner on a navigable stream in Virginia to the soil between low-water mark, where his absolute dominion terminates, and

the line of navigability. It may be noted, however, that in the recent case of *Taylor* v. *Commonwealth,* 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865, the subject in some of its aspects is ably and interestingly treated, and many of the authorities reviewed by the President of this court, whose conclusions are fairly summarized by the reporter in the syllabus of the case as folllows:

"The navigable waters beyond low-water mark and the soil under them, within the territorial limits of a state, are the property of the state, to be controlled by the state, in its own discretion, for the benefit of the people of the state. Section 1338 of the Code is, in this respect, merely declaratory of existing law as commonly received and understood, and is not a mere arbitrary assumption of right by the state. The title of riparian owners extends, by statute, to ordinary low-water mark, but no further. Beyond this the title is in the state, but the riparian owner has certain rights, such as the right to build wharves, and of access to the water, and a right of way over it to the channel, and the statutory right to locate a half acre of land as an oyster-planting ground, but these rights of the state and of the riparian owner must be exercised, if possible, so that the one shall not necessarily disturb or impair the enjoyment of the other. A riparian owner who is not disturbed in the enjoyment of an existing or contemplated use of a stream cannot complain of the fact that the state leases to a citizen a portion of the bed of a navigable stream for the purpose of sinking an artesian well and the use of the water therefrom. Whatever the soil underneath such navigable waters contains belongs to the state, and it alone has the right to develop these hidden sources of wealth for the common benefit of all its citizens. Nor will such riparian owner be permitted, capriciously and arbitrarily, to locate the half acre

for oyster planting in such a way as to include said well, when another location would be equally beneficial to him."

See also V. C., 1887, sec. 998, and the following authorities in point: *Fitchburg R. Co.* v. *B. & M. Ry.,* 3 Cush. (Mass.) 58; *Hanford* v. *St. Paul & Duluth Ry. Co.* (Minn.) 42 N. W. 596, 44 N. W., 1144, 7 L. R. A. 722; *Providence S. Co.* v. *Providence Co.* (R. I.), 34 Am. Rep. 661-667; *Carli* v. *Stillwater S. Ry. & T. Co.* (Minn.), 10 N. W. 205, 41 Am. Rep. 295; *Union Depot, &c., Co.* v. *Brunswick* (Minn.), 17 N. W. 626, 47 Am. Rep. 789; *Hamlin* v. *The Pierpont Mfg. Co.,* 141 Mass. 51, 6 N. E. 531; *White* v. *Nassau Tr. Co.* (N. Y.), 61 N. E. 171, 64 L., R. A. 275; *Yates* v. *Milwaukee,* 10 Wall. (U. S.), 504, 19 L. Ed. 984; *Potomac S. Co.* v. *Upper Potomac S. Co.,* 109 U. S. 674, 3 Sup. Ct. 445, 27 L. Ed. 1070; *Stockton* v. *Baltimore, &c., Co.,* 32 Fed. 19; *Roberts* v. *Brooks,* 71 Fed. 915; *Leverich* v. *Mayor of Mobile,* 110 Fed. 179; *Miller* v. *Mendenhall* (Minn.), 44 N. W. 1141, 8 L. R. A. 89, 19 Am. St. 224; Gould on Waters (2d ed.), p. 300; Lewis on Em. Dom. (2d ed.), sec. 83.

In the light of the findings of the commissioner that two years prior to the assignment to appellee of the submerged ground in controversy appellant had rightfully acquired the shore front between Forty-fourth and Forty-sixth streets as part of its shipbuilding plant; and it clearly appearing that the work done by the company upon and in front of its property was of a character that unmistakably indicated its purpose to occupy the water front as a shipyard, appellee was affected with notice of the use to which the property was being applied, and his acquisition of part of appellant's outshore water front, absolutely essential to its purposes, was, under the circumstances, in the nature of an intrusion; and by express provision of the oyster law he took the leased area sub-

ject to the previously acquired rights of appellant. Va. Code, 1904, sec. 2137.

"If the company having the prior right enters upon the work of constructing a system, and with reasonable diligence and in good faith does actually construct a considerable part of the system, it ought not to lose its rights unless it has failed to comply with a proper demand to complete the system, or has unreasonably delayed its completion." Elliott on Roads & Streets (2d ed.), sec. 752. Not only was the denial of appellant's superior right in contravention of the statute, but the commissioner's conclusion of law, sustained by the decree of the court, "that the plaintiff company could not use the land without paying appellee therefor," was equivalent to giving to the assignment the force and effect of depriving appellant of valuable property rights without compensation; and, in derogation of the Fourteenth Amendment of the Constitution of the United States, without due process of law.

In a note to section 2137, Va. Code, 1904, the learned annotator observes: "A person occupying submerged land, under this section, has not such title as enables him to recover against the United States damages for injury thereto and to oysters planted therein resulting from lawful action of government in dredging the river." *Richardson* v. *U. S.* (C. C.), 100 Fed. 714.

So also it has been held that "One is not entitled to damages for injury to his fishery resulting from the construction of a pier in a river, under license from the State." *Tinicum Fishery Co.* v. *Carter* (Pa.), 35 Am. Rep. 632.

Nevertheless, the practical effect of the decree of the trial court in adopting the commissioner's conclusion of law is to give precedence to appellee's inferior right, under the express provisions of the oyster law, to the previously acquired and, therefore, superior right of appellant.

The principle is of universal application, and is illustrated by numerous adjudged cases, that in the absence of express restrictions a general grant of power to do a particular thing carries with it, by implication, as an essential incident, authority to do whatever may be found reasonably necessary to render the power granted effectual. *Groner* v. *City Council, etc.,* 77 Va. 488.

"It is a well settled principle of corporation law that corporations, in the absence of express restrictions, have the implied power to do all acts that may be necessary to enable them to exercise the powers expressly conferred, and accomplish the objects for which they were created." 7 Am. & Eng. Ency. of Law, 699.

"It may do all acts that are reasonably necessary, that is, that are proper and convenient as tending directly to accomplish such objects." *Idem,* 701; *Ry. Co.* v. *Keokuk B. Co.,* 131 U. S. 385, 9 Sup. Ct. 770, 33 L. Ed. 157; *Bridgeford* v. *Hall,* 18 La. Ann. 211.

"Every corporation has, by necessary implication, the power to do whatever is necessary to carry into effect the purposes of its creation, unless the doing of the particular thing is prohibited by law or by its charter. . . . Where an express power is granted to do a particular act this carries with it, by implication, the right to do any act which may be found reasonably necessary to give effect to the power expressly granted." 10 Cyc. 1097; *Tenn. & Ala. R. Co.* v. *Adams,* 3 Head (Tenn.) 596.

"When the law doth give anything to one, it giveth impliedly whatsoever is necessary for the taking and enjoying of the same." 1 Coke-Lit. 56a; *Darcy* v. *Askwith,* Hobart, 234.

The grant of power to construct "a railroad" includes all structures which are necessary and essential to its operation.

*U. S.* v. *Denver, &c., Ry. Co.*, 150 U. S. 1, 14 Sup. Ct. 11, 37 L. Ed. 975.

"An unrestricted grant of authority to construct a railroad from one designated point to another carries with it the authority to cross a navigable stream, if the railroad cannot reasonably be constructed without doing so." *Fall River Iron Wks. Co.* v. *Old Colony, &c., R. Co.*, 5 Allen (Mass.) 221.

"A charter authorizing the construction of a railroad to a place of shipping lumber on a tidewater river, gives the right of extending the road across the flats and over the tidewater to a point at which lumber may be conveniently shipped." *Peavey* v. *Calais R. Co.*, 30 Me. 498.

"A grant of the right of wharfage, at a wharf adjoining land under water belonging to the grantor, carries with it, as a necessary incident and appurtenance, and as part of the grant, a right of way or access to the wharf for vessels over such adjacent lands.

"The State has succeeded to all the rights of both the crown and parliament of England in the navigable waters within its limits, and in the soil under them; it holds them as absolute owner, and except as restrained by constitutional limitations, its right to grant them is absolute and uncontrollable.

"Where valid grants are once made by the State the property granted can only be resumed by it when needed for the public use, under the right of eminent domain, upon making compensation." *Langdon* v. *Mayor, &c., of City of N. Y.*, 93 N. Y. 129.

Applying these well settled principles to the facts found by the commissioner, the dredging complained of was plainly a lawful exercise by appellant of its implied charter powers, for which it was in no way liable to appellee for damages.

For these reasons the decree of the Circuit Court is erroneous and must be reversed.

*Reversed.*