## Richmond.

# James River and Kanawha Power Company v. Old Dominion Iron and Steel Corporation, Etc.

March 20, 1924.

1. Evidence—*Declarations and Admissions—Pleading—Title to Bed. of River.*—In the instant case, a proceeding to establish a boundary line, plaintiff based its claim to so much of the land as lies in the bed of the James river upon two grants from the Commonwealth and traced its title. to those grants.

   *Held:* That this was an admission by the plaintiff that the title to the bed of the river was in the Commonwealth at the time of the respective grants, and that previous grants to riparian owners did not extend to the thread of the stream.

2. Navigable Waters—*Navigable Streams—Public Uses—Grant of Bed of Navigable Streams.*—Undoubtedly there are certain public uses of navigable waters which the State holds in trust for all the public, and of which the State cannot deprive them, such as the right of navigation, but, subject to these public rights, there is no reason why the beds of navigable streams may not be granted, unless restrained by the Constitution. The legislature is the representative of the people in such matters, and may exercise full power over the property of the State, except so far as that right has been ceded to the Federal government, or is restrained by the State Constitution.

3. Constitutional Law—*Constitution Not a Grant of Power—Legislative Power.*—The State Constitution is not a grant of power, and the legislature may exercise any and every legislative power of the State not forbidden by the State Constitution.

4. Navigable Waters—*Grant of Bed of Navigable Rivers—Section 175 of the Constitution of 1902.*—Section 175 of the State Constitution prohibits the legislature from leasing, renting, or selling, the natural oyster beds, rocks, and shoals in the waters of the State, and declares that the same shall be held in trust for the benefit of the people of this State, but there is no other inhibition in the Constitution on the powers of the legislature over the beds of navigable waters of the State. The result is that the legislature has the power to dispose of such beds and the waters flowing over them subject to the public use of navigation, and such other public use, if any, as is held by the State for the benefit of all the people.

5. Navigable Waters—*Grant of Bed of Navigable Rivers—Power of the Land Office.*—While for the purposes of the instant case it may be conceded that at the time when the two grants to plaintiff's predecessors in title were issued the State was the owner of the bed of the James river at the place in controversy, and had the right to make grants of the bed of that river, it may well be doubted whether such grants were within the powers conferred upon the land office which issued them, as constituted under 2 Rev. Code 1819, ch. 5, p. 365, especially in view of the later acts, 10 Hen. Stat. p. 226; 1 Rev. Code 1819, ch. 86, p. 322; Code of 1919, section 3573.

6. Public Lands—*"Waste and Unappropriated Lands"—Land Under Water.*—The terms "waste and unappropriated lands," as used in 2 Rev. Code 1819, ch. 5, p. 365, creating the land office, in the usual acceptation of the term, was peculiarly appropriate to lands which were not occupied by any one, and hence was "waste" so far as benefit to the State was concerned, and there were manifest reasons why the State should wish to sell them to those who would occupy and cultivate them. The object to be accomplished by the State was to increase its population and also its productive wealth. The phrase has no natural application to land under water. No one who bought a hundred acres of "waste and unappropriated lands" would expect to find the whole area in the bed of a navigable stream. If the land under water was intended, it would have been so stated.

7. Navigable Waters—*Grant of Bed of Navigable Streams—James River—Stare Decisis—Case at Bar.*—Whatever views the Supreme Court of Appeals, as at present constituted, may entertain as to the power of the State over the beds of navigable tidewater streams, or over the beds of nontidal streams, made navigable by statute, though not in fact navigable, the waters and soil under the bed of the James river involved in the case of *Old Dominion Iron & Nail Works* v. *Chesapeake & O. R. Co.*, 116 Va. 166, 81 S. E. 108, being "the identical waters and soil involved in the instant case," any departure from the holding in that case would work confusion and might prove disastrous to large investments made on the faith of it. Feeling bound, therefore, by the decision in that case, and consequently adhering to the holding that the bed of the river covered by grants to plaintiff's predecessors in title, one issued in 1813 and the other in 1845, was a public bed, belonging to the State of Virginia, and incapable of private ownership, and incapable of private use, no title passed by such grants.

8. Deeds—*Description—Intention of Grantor from Deed Read as a Whole—Reference to Other Deeds.*—The intention of the grantor is to be gathered from the deed when read as a whole. An insufficiency or inadequacy of description of the property conveyed, or even a misdescription in one part of a deed, may be corrected by other parts, if the language is adequate for that purpose. If the intention of the

grantor can be gathered from the language used, or the references made to other grants or conveyances, it will be given effect. Such grants or conveyances, so far as they relate to the description, will be deemed to be incorporated into the deed making the reference. The necessity for reading the deed as a whole is especially noticeable, where several descriptions are given and all of them are general in their nature.

9. DEEDS—*Descriptions—Reference to Other Deeds—Case at Bar.*—In the instant case, a proceeding to determine a boundary line, whatever title the plaintiff had to the land in controversy was acquired through a deed from the executor of one M. Defendant claimed that the description given in this deed did not embrace the line or the land in controversy. The deed contained several descriptions, and further described the property as being the same property derived by the said M. under the following deeds, fully describing them.

*Held:* That the grantor intended to convey to the plaintiff all of the lands conveyed to M. by the deeds referred to.

10. ADVERSE POSSESSION—*Possession Necessary to Constitute.*—The only possession claimed to constitute adverse possession in the instant case was that a tenant was permitted to go upon a part of the land and put up a wire fence and plant a crop of corn. Both corn and fence were washed away before the crop was gathered. No other act of adverse possession was claimed by the defendant, and this was clearly insufficient. It is claimed that the land was not susceptible of any further acts of possession, but "surely the proof of absence of occupancy and improvement by fencing, cultivation or otherwise, however good or sufficient the reason for not building, or not fencing, or not cleaning or performing any other act of ownership may be, cannot prove or tend to prove a claim by adversary possession."

11. BOUNDARIES—*Proceedings to Determine Boundaries—Pleading—Plaintiff must Designate His Boundary Line.*—Section 5490 of the Code of 1919 is a statutory remedy to have ascertained and designated the true boundary line or lines of coterminous landowners, and the plaintiff is required to designate with reasonable certainty in his petition the boundary line or lines which he seeks to establish.

12. BOUNDARIES—*Proceedings to Determine Boundaries—Ejectment.*—Section 5490 of the Code of 1919, providing a remedy to ascertain boundary lines, is not in every respect coextensive with the action of ejectment. The statute is coextensive with the action of ejectment only in cases of coterminous ownership, and, in such cases, only to the extent that the lands of the parties are shown to be coterminous.

13. BOUNDARIES—*Proceedings to Determine Boundaries—Scope of the Proceedings—Coterminous Landowners.*—In a proceeding under section 5490 of the Code of 1919 to ascertain and designate the true boundary line between plaintiff and defendants, the court will settle the line

between plaintiff and defendants so far as their lands are coterminous, but the plaintiff cannot in such proceeding contest the rights of the defendants to the use of a river in which the plaintiff has no title, nor the title of defendants to land which in no way fixes the location of the line in question.

14. APPEAL AND ERROR—*Boundaries—Weight of Findings of Trial Court—Findings Resting on Documentary Evidence—Case at Bar.*—The judgment of the trial judge as to the credibility of witnesses and the weight to be given to their testimony when the case is submitted to him on the evidence is entitled to the same weight as the verdict of a jury. But in the instant case where the lower court dismissed plaintiff's petition, in a proceeding to determine a boundary line, on the ground that plaintiff and defendant were not coterminous owners, the Supreme Court of Appeals with hesitation reversed the judgment of the lower court, its judgment being founded almost exclusively on documentary evidence, and it being convinced that there was a coterminous line between plaintiff and defendants.

15. BOUNDARIES—*Proceedings to Determine Boundaries—Case at Bar.*—In the instant case, a proceeding to determine the boundary line between plaintiff and defendants under section 5490 of the Code of 1919, the evidence established that plaintiff and defendants were coterminous owners at the west end of plaintiff's land, and therefore the trial court erred in holding that the evidence was insufficient to maintain the issue on the part of plaintiff that he was a coterminous owner with defendants.

.Error to a judgment of the Law and Equity Court of the city of Richmond, in a proceeding to ascertain a boundary line. Judgment for defendants. Plaintiff assigns error.

*Reversed in part.*

The opinion states the case.

*W. P. De Saussure, S. A. Anderson, Beverly H. Davis* and *Caton & Caton,* for the plaintiff in error.

*E. Randolph Williams* and *T. Justin Moore,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

This is a proceeding under section 5490 of the Code by the plaintiff in error against the defendant in error to establish the boundary line between them as coterminous owners. The parties waived a jury and submitted all matters of law and fact to the determination of the trial court which rendered judgment in favor of the defendant. To that judgment the plaintiff in error, which was the plaintiff in the trial court, assigns error. The land claimed by the plaintiff in its notice of motion is said to contain one hundred and thirty-one and three-fourths acres, the most of which certainly lies under the bed of James river at Richmond. The trial court held that, as to so much of the land claimed by the plaintiff as constitutes the bed of the river, it was controlled by the decisions of this court in *Old Dominion Iron and Nail Works* v. *Ches. & Ohio R. R. Co.*, 116 Va. 166, 81 S. E. 108, and *Grant* v. *C. & O. R. Co.*, 117 Va. 46, 84 S. E. 9, and that under these decisions the bed of James river at Richmond constitutes a part of the public domain of the State and "incapable now, and ever since the establishment of the Commonwealth, incapable of private ownership." The plaintiff in error insists that the ownership of the bed of the river was not involved in those cases, and that whatever was said on that subject in those opinions was *obiter* and not binding on it. The plaintiff in error further insists that the river is not navigable in law or in fact at the point where the lands of the plaintiff adjoin those of the defendant, and that the right of navigation secured by the statutes referred to in the foregoing opinions was a mere right to navigate; that it did not affect the ownership of the bed of the stream; and that as the tide did not ebb and flow at the *locus in quo*, the common law rule prevailed and a grant of land bounded by the river extended to the center of the stream.

While some of the statements in the opinion in *Old Dominion I. & N. Works* v. *Ches. & Ohio R. Co., supra,* were not necessary to the decision of the case, the rights of the Old Dominion Company as a riparian owner, were at issue. It was the owner of an island in the middle of the river called Belle Isle, containing forty-six acres, which had been granted to it by the Crown, and claimed that, by virtue of its ownership of the island, it owned to the thread of the stream on each side of it. This claim was rejected by the court, and what was said by the court had direct relation to this claim.

There is great conflict of authority in the States as to the ownership of the bed of nontidal navigable waters. The authorities are nearly evenly divided. The opposing views are well stated in 27 R. C. L. pp. 1360, 1362, sections 270 and 272, and there is a full citation of authority in the notes. These sections are as follows:

"The great size of many of the fresh water rivers of this country, and their capability of navigation, have induced some of the highest courts of several of the States to attach to them the common law consequences of navigability, thereby abrogating the common law distinction between them and those in which the tide ebbs and flows, so that grants bounded on such rivers stop at their margin. Thus in many States the same rule as to the ownership of and sovereignty over lands under the navigable fresh water rivers has been applied which obtains at common law as to the ownership of and sovereignty over lands under tide waters, and such lands are regarded as held by the same rights in the one case as the other, and subject to the same trusts and limitations.

"According to this view, in the case of large fresh water rivers which are navigable in fact, the riparian

owners do not take to the middle of the river, but the State is the owner of the subjacent soil, and the public have an easement in the river. So it has been decided that the owner of premises bounded on one of the Great Lakes takes no title to any submerged land under the waters of the lake. The wrongful diversion of the waters of a navigable river from its bed does not extinguish the title of the State thereto, or add to that of riparian owners."

Section 272: "The view that the State has title to the bed of navigable fresh water courses is not uniformly followed by all the States, but there is a strong array of authorities opposed thereto, which do not regard the greater size of rivers in the United States as furnishing a sufficient reason for departing from the rule at common law. They have, therefore, held to the strict application of the common law rule that only those rivers in which the tide ebbs and flows limit grants of lands adjoining to high water mark, and that in all others, without regard to size or capabilities for transportation and commercial intercourse, the middle of the river is the boundary of lands on either side, except in some cases where a different rule has been applied owing to the terms of the original grant, and is subject only to the public right of navigation. According to this view, where, by the law of a State, an owner of land on a river takes to the thread of the stream, a raparian owner whose land is bordered by a State boundary river takes title to the boundary between the two States regardless of whether that is nearer to or farther from the shore than the *filum aquae* of the stream. And where the lines of a grant of land from the State include a navigable river, the soil covered by the river passes with the grant, subject to the public easement of fishery and navigation, unless clearly confined within less limits by the grant,

and will also pass by a conveyance by such person.   So a conveyance of land abutting on a navigable stream vests title in the grantee to the thread of the stream, including any islands which lie between the thread of the stream and the land so conveyed, and where land on a navigable river, deeded by metes and bounds, includes the bank of the river, although no reference is made to the river, it will be presumed *prima facie* that the bed of the river to the middle is conveyed.   And where by gradual accretions the thread of the stream has been slowly changed, the riparian owner's grant follows the channel and still goes to the thread of the stream."

In our view of the evidence in the instant case, it will not be necessary to enter into any discussion of this subject.

In *Old Dominion Iron & Nail Works* v. *C. & O. R. R. Co.*, *supra*, the court confined its holding as to the right of raparian owners on James river, and in the petition for the appeal in the instant case it is said that the waters and soil involved in that case are "the identical waters and soil involved in the instant case."   Under these circumstances we shall confine what we have to say not only to James river, but to that part of the river in controversy in the instant case.

[1] The plaintiff in error bases its claim to so much of the land as lies in the bed of the river, upon two grants from the Commonwealth; one issued to Beverly Smith in 1813 for twenty-four acres, and the other to Hall Neilson in 1845 for $107\frac{3}{4}$ acres, and traces its title to these two grants.   This is an admission that the title to the bed of the river was in the Commonwealth at the time of the respective grants, and that previous grants to riparian owners did not extend to the thread of the stream, and this accords with the holding in *Old Dominion Iron & Nail Works* v. *Ches. & O. R. Co.*, *supra*.

In some of the cases in this and other jurisdictions, it has been held that the ownership by the State of the land under navigable waters is in trust for all the people of the State, and that it cannot be aliened. For instance, in *French* v. *Bankhead*, 11 Gratt. (52 Va.) 136, 169, it was said that in the case of the public square in Richmond and the navigable waters and the soil under them, the title to the property is vested in the Commonwealth for the common use and is expressly exempted from grant by Code (1819), ch. 62, sec. 1. See also *Home* v. *Richards*, 4 Call (8 Va.) 441, 2 Am. Dec. 574; *Commonwealth* v. *Garner*, 3 Gratt. (44 Va.) 689; *Norfolk City* v. *Cooke*, 27 Gratt. (68 Va.) 433; *Taylor* v. *Commonwealth*, 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865.

[2, 3] In the recent case of *Old Dominion I. & N. Works* v. *Ches. & O. R. Co.*, *supra*, it was in effect held, as stated in the opinion of the learned trial judge, that "this water in James river opposite Belle Isle near this very point was public waters, the bed was a public bed, belonging to the State of Virginia, and it was incapable of private ownership and incapable of private use." Undoubtedly there are certain public uses of navigable waters which the State does not hold in trust for all the public, and of which the State cannot deprive them, such as the right of navigation, but, subject to these public rights, there is no reason why the beds of navigable streams may not be granted unless restrained by the Constitution. The legislature is the representative of the people in such matters, and may exercise full power over the property of the State except so far as that right has been ceded to the Federal government, or is restrained by the State Constitution. The State Constitution is not a grant of power, and the legislature may exercise any and every legislative power of the

State not forbidden by the State Constitution.  *City of Roanoke* v. *Elliott*, 123 Va. 393, 96 S. E. 819.

[4] Section 175 of the State Constitution prohibits the legislature from leasing, renting, or selling, the natural oyster beds, rocks and shoals in the waters of the State, and declares that the same shall be held in trust for the benefit of the people of this State, but there is no other inhibition in the Constitution on the powers of the legislature over the beds of navigable waters of the State.  The result is that the legislature has the power to dispose of such beds and the waters flowing over them, subject to the public use of navigation, and such other public use, if any, as is held by the State for the benefit of all the people.

As said in *Newport News Shipbuilding Co.* v. *Jones*, 105 Va. 503, 513, 54 S. E. 314, 317 (6 L. R. A. [N. S.] 247), quoting from the case of *Langdon* v. *Mayor of New York*, 93 N. Y. 129: "The State has succeeded to all the rights of both the Crown and Parliament in the navigable waters within its limits, and in the soil under them.  It holds them as absolute owner, and, except as restrained by the Constitution, its right to grant them is absolute and uncontrollable."  To the same effect, see *Taylor* v. *Commonwealth*, 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865.  Of course, the grant is subject to the public right not to be prevented from, or unreasonably impeded in, navigation.  The ownership by the State of the beds of navigable tidal streams and the right to dispose of the same to private persons, subject to the public right of navigation and fishing is well settled in this State.  *Taylor* v. *Commonwealth*, 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865, and cases cited, especially *McCready* v. *Virginia*, 94 U. S. 391, 24 L. Ed. 248.  For authority in other jurisdictions, see *Saunders* v. *New York Central, etc., R. Co.*, 144 N. Y. 75, 38 N. E.

992, 26 L. R. A. 378, 43 Am. St. Rep. 729; *Shepard's Point L. Co.* v. *Atlantic Hotel*, 132 N. C. 517, 44 S. E. 39, 61 L. R. A. 937, 27 R. C. L. 1328, sec. 237, and cases cited.

It is said that the old English cases hold that tidal streams are navigable in law, whether navigable in fact or not. *Gaston* v. *Mace*, 33 W. Va. 14, 10 S. E. 60, 5 L. R. A. 392, 25 Am. St. Rep. 848, opinion by Green, J. Whether the same consequences attach to a stream made navigable by statute, when not in fact navigable, as to a tidal stream, we are not called upon to decide, as the plaintiff in the instant case is claiming title under the Commonwealth as the owner of the bed of the river.

[5] It may be conceded, therefore, for the purposes of this case, that at the time the two grants aforesaid were issued, the State was the owner of the bed of James river at the place in controversy and had the right to grant the said bed to the grantees aforesaid. But it may be well doubted whether the said grants were within the powers conferred upon the land office which issued them.

The land office was constituted by an act of the General Assembly passed in 1779 (2 Rev. Code 1819, ch. 5, p. 365), and the lands for which it was authorized to issue grants are uniformly described as "waste and unappropriated lands." The preamble of the act recites: "Whereas there are large quantities of waste and unappropriated lands within the territory of this Commonwealth, the granting of which will encourage the migration of foreigners hither, promote population, increase the revenue, and create a fund for discharging the public debt." At that time the territorial limits of the State were very extensive and the population very sparse, except in a few counties in the eastern part of the State. There were vast areas of land that were in

fact "waste and unappropriated." The land was valuable not only for its timber and minerals, but for agricultural purposes as well, and the most urgent need of the State was population. In order to induce immigration it offered these lands for sale to anyone who would buy them at the very low price of forty pounds per hundred acres.

[6] The terms "waste and unappropriated lands," in the usual acceptation of the term, was peculiarly appropriate to lands which were not occupied by anyone, and hence was "waste" so far as benefit to the State was concerned, and there were manifest reasons why the State should wish to sell them to those who would occupy and cultivate them. The object to be accomplished by the State was to increase its population and also its productive wealth. The phrase has no natural application to land under water. No one who bought a hundred acres of "waste and unappropriated lands" would expect to find the whole area in the bed of a navigable stream. If land under water was intended it would have been so stated. Color is lent to this view by the provisions of the land office act, that "any person possessing highlands to which any swamp, marshes or sunken grounds are contiguous shall have the preemption of such swamp, marsh or sunken grounds for one year after the passage of this act; and if such person shall not obtain a grant for such swamp, marsh or sunken grounds within the year then any other person may enter on and obtain a grant for the same in like manner as is directed in the case of other unappropriated lands."

This provision manifestly refers to conditions existing in the eastern part of the State where there were "swamps, marshes and sunken grounds" usually adjacent to tidal streams, but gave no right to the bed of

the stream. But it shows that when land partly under water or under water from time to time was intended to be embraced, it was expressly mentioned. The pre-emption given was to land, not to the bed of a navigable stream, and if not availed of then it was unappropriated land, and title thereto could be obtained "in like manner as directed in the case of other unappropriated lands."

When rights have been conferred in the beds of waters, it has usually been done either by an act specially conferring the right, or by act mentioning the right to be dealt with and conferring upon some court, board, commission or agency power to deal with the situation. This is well illustrated by the various acts conferring rights and powers in and over the waters, and the various acts relating to oyster planting grounds. The rights and interests of the State in the beds of its navigable waters are of a peculiar nature and would seem to be too valuable to be open to purchase by any-one who may offer the nominal price therefor asked by the State for its "waste and unappropriated lands."

Furthermore, in May, 1780, the year after the establishment of the land office, the legislature adopted the following preamble and act (10 Hen. Stat., p. 226):

"I. Whereas certain unappropriated lands on the bay, sea and river shores, in the eastern part of this Commonwealth, have been heretofore reserved as common to all the citizens thereof, and whereas by the act of General Assembly entitled an act for establishing a land office, and ascertaining the terms and manner of granting waste and unappropriated lands, no reservation thereof is made, but the same is now subject to be entered for and appropriated by any person or persons; whereby the benefits formerly derived to the publick therefrom will be monopolized by a few individuals, and

the poor laid under contribution for exercising the accustomed privilege of fishing: *Be it therefore enacted by the General Assembly*, That all unappropriated lands on the bay of Chesapeake, on the seashore, or on the shores of any river or creek in the eastern part of this Commonwealth, which have remained ungranted by the former government, and which have been used as common to all the good people thereof, shall be, and the same are hereby excepted out of the said recited act, and no grant issued by theRegister of the Land Office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law, to pass any estate or interest therein."

This exemption from grant was still further enlarged by the act of March 1, 1819 (1 Rev. Code 1819, ch. 86, p. 322), declaring that all unappropriated lands on the bay of Chesapeake, on the seashore, or on the shores of any river or creek, and the bed of any river or creek in this Commonwealth, which have remained ungranted by the former government, and which have been used as a common to all the good people thereof, shall be and the same are hereby excepted out of this act; and no grant issued by the Registrar of the Land Office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law, to pass any estate or interest therein. See also Code 1919, sec. 3573.

[7] Under these circumstances it may be well doubted whether the legislature ever intended to confer upon the land office power to grant title to the river bed as set forth in the grants to Beverly Smith and Hall Neilson, hereinbefore mentioned, and, if it did, if that power was not revoked by the acts aforesaid; but however this may be, and whatever views this court, as at present constituted, may entertain as to the power of the State

over the beds of navigable tidewater streams, or over the beds of nontidal streams, made navigable by statute though not in fact navigable, the waters and soil under the bed of James river involved in the case of the *Old Dominion Iron & Nail Works* v. *Ches. & O. R. Co.*, *supra*, being "the identical waters and soil involved in the instant case," any departure from the holding in that case would work confusion and might prove disastrous to large investment made on the faith of it. We feel bound, therefore, by the decision in that case, and consequently adhere to the holding that the bed of the river covered by the grants to Beverly Smith and Hall Neilson was " public bed, belonging to the State of Virginia, and was incapable of private ownership, and incapable of private use," and consequently no title passed by such grants.

As to the land outside of the bed of the river, the trial court held "that the evidence is insufficient to show title in the plaintiff to any portion of the land in controversy, or to maintain the issue on his part, that he is a coterminous owner with the defendants or either of them."

The two tracts of land that are alleged to be coterminous to a certain extent are the Spring Hill tract.and the Grove tract. The original Spring Hill tract contained about seventy-three acres, extending to the thread of the river. The witnesses for both the plaintiff and the defendant seem to have located the line of this tract without much difficulty. This tract was added to by purchases from time to time till the shore land, still designated Spring Hill, contained one hundred and thirty-six and a fraction acres as shown by the defendant's own testimony. To this must be added the two grants for land in the bed of the river containing 107¾ acres. On the north side of these two tracts, and be-

tween them, was a tract of forty-four or forty-six acres known as the Standard tract. In 1829 Chastian Clark dug a canal across the Standard tract "to flow water to the Spring Hill works." He obtained permission to do this from Daniel Weiseger, the then owner of the land, but Weiseger had given a prior deed of trust on the land, which had to be foreclosed, and either at the foreclosure sale, or subsequently, Holden Rhodes and Hall Neilson and his associates became joint owners of the property in the proportions of three-fourths to Rhodes and one-fourth to Neilson and his associates. The effect of this foreclosure was to nullify the right to dig the canal. Neilson owned the property to be benefited by the canal and hence desired to retain the canal. In 1845 Rhodes and Neilson, who had become the sole owner of the one-fourth interest aforesaid, selected two men to divide the Standard land between them, "taking into account the improvements and also taking into account damages occasioned by the canal belonging to Mess. L. D. & Co., and Neilson (subsequently Neilson)" and providing further that, upon the division, the land on the upper side of the river should go to Rhodes and that on the lower side should go to Neilson. This division was made, and by it Neilson acquired two acres, two roods and thirty poles of land, which he added to the Spring Hill tract, thereby changing the line between the Spring Hill and Grove tracts and moving it farther to the west. This is the line now in dispute between the parties, and is the only line where there is coterminous ownership between the parties. The railroad referred to in so many of the deeds in the chain of title had not been built at the time of the partition.

[8, 9] Whatever title the plaintiff has to the land in controversy it acquired through a deed from John R. McLean's executor. The defendant claims that the de-

scription given in this deed does not embrace the line or
the land in controversy. The deed contains several de-
scriptions. It is described as (1) *consisting* of certain
islands and shoals in James river, (2) "being so much of
what was formerly the property of the Spring Hill prop-
erty, lying north of the Southern railway (formerly the
Richmond and Danville railway) containing, together
with islands and shoals and water front and water power
embraced therein, 131¾ acres, more or less" (3) "as
appears by a plat or map thereof made by James T.
Redd & Son, dated December 13, 1886, and recorded in
the clerk's office of Henrico county, Virginia, in Deed
Book 124-A, pages 302-309, etc., a copy of which map or
plat made by T. Crawford Redd and Brother, dated
February 24, 1916, is attached hereto, and made a
part of this deed, for the purpose of more particularly
locating the said property hereby conveyed," and (4)
"being the same property derived by the said John R.
McLean under the following deeds" fully describing
them. We do not deem it necessary to decide the con-
troversy discussed at such length by counsel as to the
inadequacy or inaccuracy of descriptions 1, 2 and 3
above. We are satisfied that the grantor intended to
convey to the plaintiff all of the lands conveyed to John
R. McLean by the deeds referred to. The intention of
the grantor is to be gathered from the deed when read
as a whole. An insufficiency or inadequacy of descrip-
tion of the property conveyed, or even a misdescription
in one part of a deed, may be corrected by other parts
if the language is adequate for that purpose. If the
intention of the grantor can be gathered from the lan-
guage used, or the references made to other grants or
conveyances, it will be given effect. Such grants or con-
veyances so far as they relate to the description will be
deemed to be incorporated into the deed making the

reference.   The necessity for reading the deed as a whole is especially noticeable where several descriptions are given and all of them are general in their nature. *Allemong* v. *Gray,* 92 Va. 216, 23 S. E. 298; *State Savings Bank* v. *Stewart,* 93 Va. 447, 25 S. E. 543; *Temple* v. *Wright,* 94 Va. 338, 26 S. E. 844; *Pack* v. *Whiteacre,* 110 Va. 122, 65 S. E. 496; *Culpeper Nat'l Bank* v. *Wrenn,* 115 Va. 55, 78 S. E. 620.

This conclusion renders it necessary to ascertain what title John R. McLean acquired from those under whom he claims.   It may be conceded that the agreement of 1845 between Holden Rhodes and Hall Neilson and the award in pursuance thereof do not so designate the boundary line between the Grove track and the Spring Hill tract that the same can be now located, in the absence of the shrubs and bushes therein referred to which have disappeared.   But this line was evidently surveyed and located soon after said partition and while the natural objects referred to were probably still in existence.   On July 6, 1846, just a year after the partition, Hall Neilson had an agreement with the New England Woolen and Cotton Compay in which this line is definitely fixed in giving the description of the parcel of two acres, two roods and thirty poles of land therein referred to.   That description is as follows: "Bounded by a line commencing at a cedar tree, on the hill twenty poles from the James river, in the original west line, dividing the Spring Hill tract proper from the Grove tract, thence north eighty-seven degrees west, twenty-three poles, crossing a branch to a spruce bush corner, thirty feet west of said branch, thence *north twenty-five degrees east eighteen poles, crossing the old canal to the James river,* thence down the river twenty poles to the line first mentioned, and thence with the said line along a ditch and fence, south seventeen degrees west, twenty poles

to the beginning at the cedar." The disputed line is italicized. By this agreement Hall Neilson also undertook to convey "certain rights and interests acquired by the said Hall Neilson and others in and to the old canal passing through the property of Holden Rhodes, to the headgates at the old dam built by Clarke to flow water to the Spring Hill works." By deed bearing date February 19, 1847, from Hall Neilson to the Spring Hill Man. Co., this same line and the rights in the old canal are mentioned in the same language. By deed of February 24, 1847, the Spring Hill company conveyed the same property, using the same language as to the line and the old canal, to Neilson and Morgan, trustees. By deed of July 26, 1847, Neilson and Morgan, trustees, use the same language in a deed to Burgess B. Long, and by deed of April 27, 1850, Burgess B. Long, in conveying the same property to the Spring Hill company, uses the same language to describe the line in controversy and the rights in the old canal. Here are five deeds, within five years after the partition, giving the course and distance of the dividing line, and also conveying rights in the old canal as private property. This canal had been cut through land apart from the bed of the river in order "to pass water to the Spring Hill works." Several of the conveyances aforesaid speak of the original line between the Grove and Spring Hill tracts as "along a ditch and fence." This ditch the engineer for the plaintiff found, though the fence was gone. In fact, as already stated, there does not seem to have been any serious difficulty in locating the old dividing line. Some effort was made to show from old plats that the new dividing line was east of the spring branch, but the evidence clearly shows the contrary, and the deed under which the Spring Hill company obtained title from Burgess B. Long locates the line west of the spring branch.

An effort was also made to show that there was no spring branch at the point indicated, but it resulted only in showing that the branch was covered by a culvert constructed by the railroad company many years ago when it built its road bed. There was no evidence that the course of the branch had been in any way changed. The testimony of the defendant's chief witness seems to confirm location and direction of this line. But it is said that the courses and distances given by Clark, engineer of the plaintiffs, do not correspond with those called for in the deed from Burgess B. Long and in other deeds. Of this we have no means of knowledge, but we are of opinion that the course and distance given in the Long deed "N twenty-five degrees E, eighteen poles, crossing the old canal to James river," subject to such changes as may be necessary by the magnetic variations and such correction of actual measurements of distance as may be required, is the correct dividing line between the Grove and Spring Hill tracts of land. This line was established before the construction of the Richmond and Danville (now Southern) railroad, and while the line remains the same, there has been a change of ownership of the lands lying north and south of said railroad.

Some time after 1850 the Richmond and Danville Railroad Company (now Southern) acquired a strip of land eighty feet wide along the northern border of both the Grove and Spring Hill tracts and near the river. This acquisition left five or six acres of the Grove tract north of the railroad and between it and the river. The Grove tract was then owned by Holden Rhodes. He died in possession of it, and it passed, under his will and by subsequent conveyances which are traced in the record, to Charles W. Turner, who, by deed dated December 9, 1886, conveyed it to T. C. Williams. The tract contained 187 acres, and the deed conveyed the land lying on both sides of the railroad.

[10] By sundry conveyances, which need not be re-cited, E. S. Hamlin became the owner of the whole of the Spring Hill property containing about one hundred and thirty acres of main land and "about an equal number of islands and rocks in James river contiguous to the main land." Hamlin, by deed dated May 20, 1873, conveyed an undivided fourth interest to J. J. Faran, and by deed dated May 19, 1873, conveyed another undivided fourth interest to Washington McLean. On November 3, 1886, these three parties made partition among themselves of so much of the Spring Hill tract as lay *south of the railroad.* In this partition Hamlin got eighty-four and eighty-four one hundredths acres on the west side of the tract next to the Grove tract, and Faran and McLean got thirty-six acres on the east side of the tract. Hamlin had given a deed of trust on this land and in a foreclosure suit John E. Taylor became the purchaser of the eighty-four and eighty-four one hundredths acres south of the railroad and of Hamlin's undivided half of the land, including that in the bed of the river, north of the railroad. By deed dated December 9, 1886, Taylor conveyed to T. C. Williams the eighty-four and eighty-four one hundredths acres south of the railroad, and expressly excluded from his grant the land lying north of the railroad. It will be observed that by this grant and the deed above mentioned from Charles W. Turner, the title to all of the Spring Hill tract lying south of the railroad and to all of the Grove tract on both sides of the railroad became united in T. C. Williams. These two tracts thus acquired, Williams conveyed to Pace, and Pace to Abells, and Abells to the Southside Land and Improvement Company in June, 1889. The deeds convey the eighty-four and eighty-four one hundredths acres of the Spring Hill tract south of the railroad and expressly exclude any part of the

tract lying north of the railroad.   By deed dated July 20, 1899, the Southside Land and Improvement Company conveyed to Paschal Davie "all that part of the land belonging to the Southside Land and Improvement Company of Virginia that lies north of the R. & D. R. R. between Reedy creek on the west and Canoe run on the east and extending to the James river, with all riparian rights and privileges; all of which will appear by reference to map made by J. E. LaPrade & Son, dated June 28, 1899, and to be duly recorded simultaneously herewith."   Davie conveyed the same property to Leonard in August, 1908; Leonard conveyed to Frank Gould February 24, 1911, and Gould conveyed to the defendant on May 1, 1911.   It will be observed that the Abells did not convey to the Southside Land and Improvement Company any part of the Spring Hill tract north of the railroad, but on the contrary expressly excluded it, and that the company never acquired title from any source to any part of the Spring Hill tract north of the railroad.   But it is said that the deed to Davie gave color of title to all of the land lying between the railroad and the river from Reedy creek on the west to Canoe run on the east, and that this color of title had ripened into a perfect title by reason of adverse possession of the defendant and those under whom it claims. Conceding, for the purposes of the case, that the deed to Davie constituted color of title, there was no such adverse possession as would constitute title.   The only possession ever taken of any part of the land was that, in 1899 or 1900, a partner of Davie's in the purchase permitted a tenant to go upon a part of the land near Reedy creek and put up a wire fence and plant a crop of corn, but both corn and fence were washed away before the crop was gathered.   No other act of adverse possession is claimed by the defendant, and this was

clearly insufficient. It is claimed that the land was not susceptible of any further acts of possession, but "surely the proof of absence of occupancy and improvement by fencing, cultivation or otherwise, however good or sufficient the reason for not building, or not fencing, or not cleaning or performing any other act of ownership may be, cannot prove or tend to prove a claim by adversary possession." *Richmond* v. *Jones, etc.*, 111 Va. 314, 217, 68 S. E. 181, 182. The plaintiff does not claim title to any part of the Grove tract either in the pleadings or the evidence, but claims title to that part of the Spring Hill tract lying north of the railroad under the following conveyances: By deed dated July 13, 1888, Taylor conveyed to Cannon "an undivided one-half interest in and to that certain property being a part of the 'Spring Hill' property lying and situate partly in Chesterfield and partly in Henrico counties and containing certain islands, shoals, water front and water power property being 131¾ acres in extent and accurately described in a plat and survey annexed to a deed from L. R. Page and C. C. McRae, special commissioners, dated 8th of December, 1886, recorded in volume 73, page 222, and plat recorded in volume No. 1, page 173, Chesterfield court clerk's office, to which reference is hereby made," and Cannon conveyed the same property to John R. McLean in May, 1891. The other undivided half was acquired by John R. McLean by deeds from J. J. Faran and Washington McLean's executor.

[11-13] We are not here concerned, however, with the title of the parties to any part of the land except the western boundary claimed by the plaintiff, which is the only place where it can be said that their boundaries are coterminous. Section 5490 of the Code is a statutory remedy to have ascertained and designated the true boundary line or lines of coterminous landowners, and

the plaintiff is required to designate with reasonable certainty in his petition the boundary line or lines which he seeks to establish. The section is not in every respect coextensive with the action of the ejectment. The statute is coextensive with the action of ejectment only in cases of coterminous ownership, and, in such cases, only to the extent that the lands of the parties are shown to be coterminous. We will settle the line between the plaintiff and the defendant, therefore, so far as their lands are coterminous, but the plaintiff cannot in this proceeding contest the rights of the defendant to the use of the river in which the plaintiff has no title, nor the defendant's title to land which in no way fixes the location of the line mentioned.

Without going into a further detailed statement of the evidence, we are of opinion that the true western boundary of the plaintiff's land north of the Southern railroad's line, mentioned in the notice, is fixed by the deed from Burgess B. Long to the Spring Hill company, dated April 26, 1850; that the old dividing line between the Spring Hill and Grove farms was along a ditch which is still visible; that the location of the cedar tree on the hill mentioned in the deed from Morgan & Neilson, trustees, to Burgess B. Long, dated July 26, 1874, was twenty poles from James river along said old dividing line, which can be readily ascertained by measuring from the river along said old dividing line; and that to these data the courses and distances given in the Long deed should be applied, making such changes as are made necessary by reason of magnetic variations, and such changes, if any, in actual measurements as are needed to reach designated points.

[14] We are not unmindful of the fact that the judgment of the trial judge as to the credibility of witnesses and the weight to be given to their testimony, when the

case is submitted to him on the evidence, is entitled to the same weight as the verdict of a jury (*Martin* v. *Richmond*, 101 Va. 406, 411, 44 S. E. 695; *Rogers* v. *Commonwealth*, 132 Va. 771, 781, 111 S. E. 231) and we have hesitated to differ from his conclusions, but our judgment is founded almost exclusively on documentary evidence, and we are convinced that there is a coterminous shore boundary between the plaintiff and the defendant, north of the line of the Southern railway, and that this boundary line is as pointed out above.

The trial court, we think properly limited the inquiry to the boundary line on the shore, and refused to consider any question of easements of the defendant or the right to abut its dam on the shore at some point other than on the coterminous boundary line on the shore. We limit our holding in the same manner. We fix the western shore boundary of the plaintiff as hereinbefore indicated, but whether the canal at other points constituted a part of the bed of the river, or what are the rights of the parties respectively east of the line established, or what easements the defendant has in the river, we leave undecided. There are two canals referred to in the record, and the rights of the parties may not be the same as to each. This question was not settled in the trial court.

[15] So far as the judgment of the trial court denies the title of the plaintiff to any portion of the bed of James river, it is affirmed. So far as it refuses to establish the boundary line between the plaintiff and the defendant at the west end of the plaintiff's land where they are coterminous owners, it is reversed, and said line is established as above indicated, and all of the relief to which the plaintiff is entitled in this proceeding having been accomplished, the case will be dismissed, without prejudice to the right of the plaintiff, in any proper pro-

ceeding it may adopt, to assert any title it may have to any of the shore land on James river east of the line above established. The defendant in error, as the party substantially prevailing, is entitled to a judgment for its costs.

*Reversed in part.*